### In re AOL TIME WARNER, INC. SECURITIES AND "ERISA" LITIGATION

### MDL No. 1500. No. 02 Civ. 5575(SWK).

United States District Court, S.D. New York.

May 5, 2004.

See, also, 2003 WL 21729842.

Christopher J. Gray, Lead Atty., Lovell & Stewart, L.L.P., New York, NY, Corey D. Holzer, Lead Atty., Holzer Holzer & Cannon LLC, Atlanta, GA, for Jennifer J. Fadem.

Brian Philip Murray, Rabin, Murray & Frank LLP, New York, NY, for Jennifer J. Fadem, Salomon Hami.

Aaron Lee Brody, Lead Atty., Stull, Stull & Brody, New York, NY, for Salomon Hami.

Holly K. Kulka, Timothy P. Wei, Michael L. Rugen, Lead Attys., Heller Ehrman White & McAuliffe, LLP, New York, NY, for Ernst & Young LLP.

Blair G. Connelly, Lead Atty., Latham & Watkins, L.L.P., New York, NY, for Eric Keller.

Corey D. Holzer, Lead Atty., Holzer Holzer & Cannon LLC, Atlanta, GA, for Steven Schmalz, Mariam Antin, Mark Bluestein, Malka Birnbaum, Ernest Hack, Harvey Matcovsky, Delbert Currens, Howard Rosengarten, Alan Russo, Harriet Goldstein, Barbara Dietel, Earl Bennett, Jack L. McBride, Vardan Sarkisov, Sherry

Weindorf, Earl Mikolitch, John Pleggenkuhle, Prena Smajlaj.

Samuel Howard Rudman, Lead Atty., Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P., New York, NY, for Steven Schmalz, Delbert Currens.

Mariam Probst Rosner, Lead Atty., Wolf, Popper, L.L.P., New York, NY, for Mariam Antin.

Brian Philip Murray, Lead Atty., Rabin, Murray & Frank LLP, New York, NY, for Mark Bluestein.

Gregory Michael Egleston, Lead Atty., Bernstein, Liebhard & Lifshitz, LLP, New York, NY, for Malka Birnbaum.

Robert I. Harwood, Lead Atty., Wechsler Harwood LLP, New York, NY, for Ernest Hack.

Jules Brody, Lead Atty., Stull Stull & Brody, New York, NY, for Harvey Matcovsky.

Jill S. Abrams, Lead Atty., Abbey Gardy, LLP, New York, NY, for Howard Rosengarten.

Menachem E. Lifshitz, Lead Atty., Bernstein, Liebhard & Lifshitz, L.L.P., New York, NY, for Alan Russo, Harriet Goldstein.

Frederic Scott Fox, Lead Atty., Kaplan Fox & Kilsheimer, L.L.P., New York, NY, for Barbara Dietel.

Aaron Lee Brody, Lead Atty., Stull Stull & Brody, New York, NY, for Earl Bennett.

Thomas H. Burt, Lead Atty., Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, NY, for Jack L. McBride.

Ira M. Press, Lead Atty., Kirby, McInerney & Squire, L.L.P., New York, NY, for Vardan Sarkisov.

James V. Bashian, Lead Atty., Law Offices of James V. Bashian, P.C., New York, NY, for Sherry Weindorf.

Patrick Anthony Kingman, Lead Atty., Schatz and Nobel PC, Hartford, CT, for Earl Mikolitch.

Frederick Taylor Isquith, Sr., Lead Atty., Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, NY, for John Pleggenkuhle.

Nadeem Faruqi, Lead Atty., Faruqi & Faruqi, L.L.P., New York, NY, for Prena Smajlaj.

*OPINION AND ORDER*

KRAM, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION .................................................201

II. PROCEDURAL HISTORY OF THIS ACTION ...........................202

III. THE PARTIES.................................................203

IV. THE COMPLAINT ...............................................204

V. PLAINTIFF'S SUBSTANTIVE CLAIMS ...............................205
 A. Section 11 ................................................205
 B. Section 12(a)(2) ..........................................205
 C. Section 15 ................................................205
 D. Section 13 ................................................205
 E. Section 10(b)..............................................206
 F. Section 14 ................................................206
 G. Section 20 ................................................206
 H. 28 U.S.C. § 1658 ("Sarbanes–Oxley") ......................206

VI. LEGAL STANDARD FOR MOTION TO DISMISS ........................206

VII. APPLICABLE STATUTE(S) OF LIMITATIONS ........................207
 A. This Action Was Filed on September 16, 2002 ...............207
 B. Sarbanes–Oxley Applies to MSBI's 10(b) Claims ............208

VIII. AN AOL INVESTOR OF "ORDINARY INTELLIGENCE" WOULD
 NOT HAVE BEEN AWARE OF THE PROBABILITY THAT SHE
 HAD BEEN DEFRAUDED PRIOR TO JULY 18, 2002 ................209
 A. The Sun, Hughes and Gateway Transactions Are Insufficient To
 Trigger Plaintiff's Duty to Inquire.................................210
 B. The Vendor Advertising and Equity Deals Are Also Insufficient to
 Trigger Plaintiff's Duty to Inquire.................................210

IX. THE CLAIMS AGAINST THE NEWLY–NAMED DEFENDANTS ARE
 TIMELY .....................................................212

X. BECAUSE THE AMENDED COMPLAINT IS TIMELY, ALLEGA-
 TIONS OF TOLLING ARE UNNECESSARY ..........................212

XI. MSBI HAS PROPERLY PLED COMPLIANCE WITH THE STATUTE
 OF LIMITATIONS .............................................212

XII. THE AMENDED COMPLAINT PLEADS ALLEGED MISSTATE-
 MENTS WITH PARTICULARITY .....................................213
 A. Allegedly Overstated A & C Revenue ........................214

 B. The Sections 11 and 12(a)(2) Claims Based on the Merger
 Registration Statement Are Pled With Particularity ............... 216

XIII. WITH THE EXCEPTIONS NOTED BELOW, THE SECTION 10(B)
 CLAIMS ARE NOT DISMISSED ........................................ 216
 A. MSBI May Proceed Under Rules 10b–5(a) & (c) ....................... 217
 B. It is Axiomatic That a Claim Under Section 10(b) Must Allege
 Facts Giving Rise To a Strong Inference of Fraudulent Intent..... 217
 1. MSBI Has Not Adequately Pled Motive And Opportunity .......... 218
 2. MSBI Has Satisfactorily Pled Conscious Misbehavior or
 Recklessness With Respect to Some, But Not All of the
 Defendants ........................................................ 219
 3. MSBI Has Adequately Alleged Scienter With Respect to
 Corporate Defendants AOLTW and AOL ...................... 219
 4. MSBI Has Adequately Alleged Conscious Misbehavior or
 Recklessness With Respect to Defendants Pittman, Kelly,
 Pace, Keller and Colburn, But Not With Respect to Defen-
 dants Schuler, Novack, Levin, Parsons, Ripp, Rindner,
 Berlow or Case .................................................. 220
 a. Robert W. Pittman ......................................... 220
 b. J. Michael Kelly ........................................... 221
 i. Kelly's Statements Do Not Qualify for Protection
 Under Either the "Bespeaks Caution" Doctrine or
 the PSLRA Safe Harbor ........................... 222
 c. Barry Schuler .............................................. 223
 d. Kenneth J. Novack ........................................ 224
 e. Gerald Levin .............................................. 224
 f. Wayne H. Pace ........................................... 225
 g. Richard Parsons .......................................... 225
 h. Joseph Ripp .............................................. 225
 i. Eric Keller ................................................ 226
 i. Keller Is Not Subject to Section 11 Liability .............. 227
 ii. The 10(b) Claim is Timely ................................ 227
 j. Steven Rindner ........................................... 227
 k. Myer Berlow .............................................. 228
 *l.* David Colburn ............................................ 229
 m. Stephen M. Case ......................................... 230

XIV. THE SECTIONS 10(B) AND 14(A) CLAIMS ADEQUATELY PLEAD
 LOSS CAUSATION .................................................. 231

 XV. AOLTW'S ARGUMENTS IN SUPPORT OF DISMISSAL OF THE
 SECTION 14(A) CLAIMS ARE UNPERSUASIVE ...................... 232

XVI. MSBI'S CLAIMS UNDER SECTION 12(A)(2) BASED ON THE BOND
 OFFERINGS ARE DISMISSED AS TO AOLTW AND THE INDI-
 VIDUAL DEFENDANTS ............................................. 232

XVII. MSBI'S SECTION 11 CLAIMS BASED ON THE BOND REGISTRA-
 TION STATEMENT (COUNTS FIVE AND SIX) ARE DISMISSED
 AS TO AOLTW AND THE INDIVIDUAL DEFENDANTS ............... 233

XVIII. MSBI'S SECTIONS 15 AND 20 CLAIMS FOR CONTROL PERSON
 LIABILITY ARE DISMISSED WITH RESPECT TO SOME, BUT
 NOT ALL OF THE INDIVIDUAL DEFENDANTS ...................... 233

 XIX. ERNST & YOUNG'S MOTION TO DISMISS IS GRANTED IN PART
 AND DENIED IN PART ............................................. 235

 A. The Section 11 Claim Based on the Bond Registration Statement (Count 7) Is Dismissed With Prejudice ............................236

 B. The Section 11 Claim Based on the Merger Registration Statement (Count 3) Is Timely.........................................236

 1. The Section 11 Merger Registration Claim Is Pled With Particularity ........................................237

 C. MSBI's Section 10(b) Claim Against E & Y Properly Pleads Scienter .............................................237

 1. No Class Member Who Purchased Shares Prior to August 13, 1999 Has a 10(b) Claim Against Ernst & Young .................238

 2. The 10(b) Claims Are Pled with Particularity .....................238

 3. MSBI Has Pled Facts Giving Rise To A Strong Inference that E & Y Acted With Scienter ....................................239

 a. MSBI Has Not Alleged Motive and Opportunity ..............239

 b. MSBI Has Adequately Alleged Reckless Misbehavior by E & Y .............................................239

 i. The Allegations in the Amended Complaint are Factually and Legally Distinguishable From *Zucker*.....239

 ii. When Combined With the GAAS and GAAP Violations and AOLTW's Dependence on Advertising Revenue to Meet Earnings Targets, the "Red Flags" Allegedly Ignored by E & Y Are Sufficient to Plead Scienter ....................................240

 D. MSBI's Section 14(a) Claim, As Circumscribed Below, Is Actionable .............................................241

XX. MORGAN STANLEY'S MOTION TO DISMISS COUNTS FOUR AND SEVENTEEN IS GRANTED ........................................242

 A. Statements of Opinion Are Actionable Only If Both Objectively and Subjectively False .........................................243

XXI. THE MOTION TO DISMISS OF THE BOND UNDERWRITERS AND DEFENDANT CITIGROUP IS GRANTED ............................244

 A. Plaintiffs Lack Article III Standing ...............................245

 1. MSBI Has Not Alleged "Injury in Fact" ..........................245

 2. MSBI Has Not Pled Facts Which Establish an Injury Under Sections 11 and 12(a)(2) .......................................246

 a. MSBI Has Not Demonstrated Losses Under Section 11(e).....246

 b. MSBI Has Not Stated a Claim for Damages or Rescission Under Section 12(a)(2) .................................246

XXII. LEAVE TO REPLEAD .............................................247

XXIII. CONCLUSION ...................................................248

*APPENDICES* ......................................................248

A1. Section 11 .......................................................248
A2. Section 12 .......................................................249
A3. Section 14(a) .....................................................249
A4. Section 10(b) .....................................................249
A5. Sections 15 and 20 ...............................................249

## I. INTRODUCTION

On July 18 and 19, 2002, *The Washington Post* published a two-part article, "Unconventional Transactions Boosted Sales, Amid Big Merger, Company Resisted Dot–Com Collapse," reporting allegations that AOL Time Warner Inc. had substantially overstated publicly reported advertising

revenue.[1] Within hours of the article's publication, Defendant Robert Pittman, AOLTW's Chief Operating Officer, Board member, and Head of Operations for the AOL division of the Company, resigned. On July 24, 2002, AOLTW acknowledged that the Securities and Exchange Commission ("SEC") was investigating AOLTW's accounting practices. Amended Complaint ("AC") ¶ 5. On July 31, 2002, the Company confirmed that the Department of Justice ("DOJ") had commenced a criminal investigation of AOLTW's accounting practices. *Id.*[2]

On August 14, 2002, AOLTW issued a press release, along with its SEC Form 10–Q filing, in which it publicly acknowledged that advertising revenue "may have been overstated" in the amount of $49 million with respect to three transactions over a period of six quarters from 4Q 2000 to 1Q 2002. *Id.* ¶¶ 5–6.

On October 23, 2002, the Company restated the financial statements of AOL and AOLTW for eight consecutive quarters (July 1, 2000 through June 30, 2002) by reducing its advertising revenue in the amount of $190 million. Along with its financial restatement, the Company's Form 8–K filing with the SEC stated:

> As a result of the restatement announced on October 23, 2002 by AOL and AOL Time Warner Inc. (the "Company"), the Company's financial statements for the affected periods should no

longer be relied upon, including the audited financial statements for 2000 and 2001 contained in the Company's annual report on Form 10–K for the year ended December 31, 2001.

*Id.* ¶ 6.

On March 28, 2003, in its SEC Form 10–K filing, AOLTW reported that it may restate AOL advertising revenue by an additional $400 million for the years 2001 and 2002. *Id.* The Company also stated that, "it is possible that further restatement of the Company's financial statements may be necessary," with respect to "the range of other transactions" being investigated by the SEC and DOJ. AC ¶ 6.

To date, the Company has either restated, or acknowledged the possibility of restating advertising revenue in the amount of $477 million. *Id.* ¶ 7.

## II. PROCEDURAL HISTORY OF THIS ACTION

On July 18, 2002, the day that the first *Washington Post* article was published, two shareholder class action complaints were filed in this Court alleging violations of § 10(b) of the Exchange Act. *See* Butler Decl. Ex. 29 & 30. Those two initial class action complaints were followed by 27 similar class action complaints, including one filed by the Minnesota State Board of Investment ("MSBI") on September 16, 2002. Butler Decl. Ex. 31.

---

1. On January 11, 2001, American Online ("AOL") merged with Time Warner in what analysts described as the "deal of the century." The merged entity was called AOL Time Warner ("AOLTW" or the "Company"). However, on October 10, 2003, in an effort to "better reflect the portfolio of our investors," defendant AOLTW changed its name to Time Warner, Inc. To avoid confusion, in this and subsequent opinions, the Court will refer to the merged entity as AOLTW, or the Company.

2. As of the date of this opinion, both the SEC and DOJ investigations are continuing. *See* Memorandum of Law in Support of the AOL Time Warner Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint, dated July 14, 2003, at 8 ("AOLTW Memo"). However, according to an April 13, 2004 article in *The Washington Post*, the SEC is preparing to formally accuse AOLTW for booking more than $400 million in questionable revenue following the January 2001 Merger.

All of these putative class actions have been consolidated before this Court and the Court has appointed MSBI as the sole lead plaintiff. On April 15, 2003, MSBI filed the Amended Complaint. In addition to claims under § 10(b) of the Exchange Act asserted in prior complaints, the Amended Complaint added new claims under § 11 and § 12(a)(2) of the Securities Act, as well as § 14(a) of the Exchange Act, relating to the Merger Registration Statement and Merger Proxy. AC Counts 1–4, 14–17. The Amended Complaint also added new claims under § 11 and § 12(a)(2) relating to the Shelf Registration Statement and the Supplemental Prospectuses issued in connection with bond offerings in April 2001 and April 2002. *Id.* Counts 5–11. Finally, the Amended Complaint contains claims, some of which were present in prior complaints, for control person liability under § 15 of the Securities Act and § 20 of the Exchange Act. *Id.* Counts 12–13, 20.

## III. THE PARTIES

The Lead Plaintiff is the Minnesota State Board of Investment. MSBI is an agency established by Article XI of the Minnesota Constitution and laws of the State of Minnesota for the purpose of administering and directing investment of all state funds and pension funds. AC ¶ 31. During the Class Period, MSBI acquired approximately 3,073,050 shares of AOL stock, exchanged approximately 2,610,780 shares of Time Warner stock for AOLTW stock pursuant to the Merger, and purchased approximately 5,769,839 shares of AOLTW stock. MSBI also purchased ap-

proximately $44,679,246 worth of AOLTW debt securities. *Id.*

Numerous additional plaintiffs are included in the consolidated action. *See* AC at Exhibit C. During the Class Period, it is alleged that each additional plaintiff purchased or otherwise acquired securities of AOL or AOLTW, and suffered damages.

The Amended Complaint names AOL Time Warner Inc., America Online, Inc., and Time Warner Inc. as corporate defendants. AC ¶¶ 33–35. The Amended Complaint names the following officers and directors of AOL prior to the Merger as individual defendants: Stephen M. Case, former Chairman of the Board of AOLTW; Robert W. Pittman, former Chief Operating Officer of AOLTW; J. Michael Kelly, former Chief Operating Officer of the AOL subsidiary of AOLTW and current Chairman and Chief Executive of AOL International and Web Services; David M. Colburn, former Executive Vice–President and President of Business Affairs and Development for AOLTW; Eric Keller, former Senior Executive Vice President of Business Affairs and Development; Joseph A. Ripp, Vice Chairman of AOL; Myer Berlow, Senior Advisor to AOLTW, Barry Schuler, Chairman and Chief Executive Officer of AOL; Steven Rindner, former Senior Vice President of Business Affairs and Development for AOLTW; and Kenneth J. Novack, member of the Board of Representatives of Time Warner Entertainment. AC ¶ 36.[3]

The Amended Complaint names the following officers and directors of Time Warner prior to the Merger as individual defendants: Gerald M. Levin, former Chief

---

**3.** Defendants Myer Berlow, Stephen M. Case, David M. Colburn, Eric Keller and Steven Rindner filed separate and individual motions to dismiss; however, the legal issues raised in those motions are substantially related to those presented by defendant AOLTW and the individual defendants in their papers. Accordingly, the Court decides the motions of defendants Berlow, Case, Colburn, Keller and Rindner in this opinion. *See infra* at 226–31.

Executive Officer of AOLTW; Richard D. Parsons, Chief Executive Officer of AOLTW and Chairman–Elect of the AOLTW Board of Directors; and Wayne H. Pace, Chief Financial Officer of AOLTW.

The Amended Complaint names the following additional individual defendants: Paul T. Cappucio, Executive Vice President, General Counsel and Secretary of AOLTW; Miles R. Gilburne, Director of AOLTW; James W. Barge, Senior Vice President and Controller for AOLTW; Daniel F. Akerson, Director of AOTLW and member of the Company's Audit and Finance Committee; Stephen F. Bollenbach, Director of AOLTW and Chair of the Audit and Finance Committee; Frank J. Caulfield, Director of AOLTW; and Franklin D. Raines, Director of AOLTW and member of the Audit and Finance Committee. AC ¶ 46.

The Amended Complaint names Ernst & Young LLP as a defendant.[4] Ernst & Young is a certified public accounting firm that provided auditing and accounting services to AOL and AOLTW. *Id.* ¶ 46.

The Amended Complaint also names underwriter defendants Morgan Stanley & Co. ("Morgan Stanley"), Salomon Smith Barney Inc. ("Salomon"), Citigroup, Inc. ("Citigroup"), Banc of America Securities LLC ("Banc of America"), and J.P. Morgan Chase & Co. ("J.P. Morgan"). *Id.* ¶¶ 48–62.[5]

## IV. THE COMPLAINT

The Amended Complaint alleges that AOL and AOLTW improperly accounted for at least 19 separate advertising transactions that impacted Advertising and Commerce ("A & C") revenue and advertising backlog in each of 14 calendar quarters from 4Q 1998 to 2Q 2002. AC ¶¶ 140–251. The Amended Complaint alleges that, as a result of fraudulent accounting, revenue and backlog were overstated in various SEC filings, press releases and other public statements made from January 27, 1999 to July 24, 2002 (the "Class Period"). The Amended Complaint alleges that, because advertising revenue was overstated at the time of the Merger, goodwill from the AOL/Time Warner Merger was also overstated during part of the Class Period. AC ¶ 424. The Amended Complaint also alleges that certain individual defendants made misleading oral statements between October 2000 and April 2001. These statements are alleged to have been misleading because the speakers knew or were reckless in not knowing about overstated A & C revenue and backlog at the time the statements were made. *Id.* ¶ 330. In sum, the Amended Complaint alleges that AOLTW has overstated advertising revenue by at least $1.7 billion, causing billions of dollars in damage to investors, and amounting to "one of the largest frauds ever committed in the United States securities markets." *See* Memorandum of Lead Plaintiff MSBI in Opposition to Motion to Dismiss of the AOLTW Defendants, and Separate Mo-

---

**4.** Defendant Ernst & Young filed a separate and individual motion to dismiss, which, due to substantial overlap, is also addressed by this Opinion. *See infra* at 235–42.

**5.** Defendant Citigroup, on behalf of itself and the underwriter defendants, filed a separate motion to dismiss on July 14, 2003. In addition, defendant Morgan Stanley filed separately its Motion to Dismiss Counts Four and

Seventeen of the Amended Consolidated Class Action Complaint. Lead Plaintiff MSBI opposed both Citigroup and Morgan Stanley's motions in its Opposition to Motion to Dismiss of Bond Underwriter Defendants and Motion to Dismiss of Defendant Morgan Stanley as Financial Advisor, filed September 29, 2003. These motions are also covered by this Opinion. *See infra* at 242–47.

tions to Dismiss of Defendants Ernst & Young LLP, Stephen Case, Myer Berlow, David Colburn, Eric Keller and Steven Rindner, dated September 29, 2003, at 1 ("MSBI Opp.").

Corporate defendants AOL Time Warner, American Online, Inc. and Time Warner Inc., and individual defendants Daniel F. Ackerson, James W. Barge, Stephen F. Bollenbach, Paul T. Cappuccio, Frank J. Caufield, Miles R. Gilburne, J. Michael Kelly, Gerald M. Levin, Kenneth J. Novack, Wayne H. Pace, Richard D. Parsons, Robert W. Pittman, Franklin D. Raines, Joseph A. Ripp, and Barry Schuler move to dismiss the Consolidated Amended Class Action complaint filed by MSBI on April 15, 2003. Defendants Stephen Case, Myer Berlow, David Colburn, Eric Keller and Steven Rindner each move, individually, to dismiss the Amended Complaint. In addition, Defendants Ernst & Young LLP, Morgan Stanley & Company and the Bond Underwriters move to dismiss.

## V. PLAINTIFF'S SUBSTANTIVE CLAIMS

MSBI alleges violations of numerous securities laws, some of which stem from the Securities Act of 1933 ("Securities Act") and some of which stem from the Securities Exchange Act of 1934 ("Exchange Act"). In total, MSBI alleges violations of §§ 11, 12(a) and 15 of the Securities Act of 1933 and §§ 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934. A brief description of the statutory provisions that form the bases of MSBI's claims follows.

### A. Section 11

Section 11 of the Securities Act provides that any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading...." 15 U.S.C. § 77k(a).

### B. Section 12(a)(2)

Section 12(a)(2) of the Securities Act, previously known as Section 12(2), allows a purchaser of a security to bring a private action against a seller that "offers or sells a security ... by means of a prospectus or oral communication, which contains an untrue statement of material fact or omits to state a material fact necessary in order to make the statements ... not misleading." 15 U.S.C. § 77l(a)(2).

### C. Section 15

Section 15 of the Securities Act provides that "Every person who ... controls any person liable under section 11 or 12 [15 USCS § 77k or 77l] shall also be liable jointly and severally with and to the same extent as the controlled person ... unless the controlling person had no knowledge of ... the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.

### D. Section 13

Section 13 of the Securities Act sets forth the statute of limitations for Securities Act claims:

No action shall be maintained to enforce any liability created under section 77k [Section 11] or 77l(a)(2) [Section 12(a)(2)] of this title unless *brought within one year after the discovery of the untrue statement or the omission,* or after such discovery should have been made by the exercise of reasonable diligence ... *In no event shall any action be brought* to enforce a liability created under section 77k or 77l(a)(2) of this title *more than three years after the security*

*was bona fide offered to the public,* or under section 77*l*(a)(2) of this title more than three years after the sale.

15 U.S.C. § 77m (emphasis added).

### E. Section 10(b)

Section 10(b) of the Exchange Act provides that "It shall be unlawful ... (a) To effect a short sale ... of any security ... in contravention of such rules and regulations as the Commission may prescribe ... (b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j.

### F. Section 14

Section 14(a) of the Exchange Act provides that "It shall be unlawful for any person, by use of the mails ... or otherwise ... to solicit or permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title." 15 U.S.C. § 78n(a).

### G. Section 20

Section 20 of the Exchange Act provides that "Every person who, directly or indirectly, controls any person liable under any provision of this title ... shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

### H. 28 U.S.C. § 1658 ("Sarbanes–Oxley")

On July 30, 2002, in response to a wave of corporate accounting scandals that un-dermined the integrity of the financial markets, Congress enacted Sarbanes–Oxley. Section 804 of Sarbanes–Oxley lengthened the statute of limitations for private causes of action alleging securities fraud. Section 804 is entitled "Statute of Limitations for Securities Fraud," and provides, in pertinent part:

> a private right of action that *involves a claim of fraud, deceit, manipulation, or contrivance* in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)), may be brought not later than the earlier of—
>
> (1) 2 years after the discovery of the facts constituting the violation; or
>
> (2) 5 years after such violation

28 U.S.C. § 1658 (emphasis added).

## VI. LEGAL STANDARD FOR MOTION TO DISMISS

When deciding a motion to dismiss, "a court must accept as true the factual allegations of a complaint." *In re IPO Sec. Litig.,* 241 F.Supp.2d 281, 295 (S.D.N.Y. 2003). In addition, such factual allegations must be construed in the light most favorable to plaintiffs. *Easton v. Sundram,* 947 F.2d 1011, 1014–15 (2d Cir.1991). This is because, at the motion to dismiss stage, "the issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Wright v. Ernst & Young LLP,* 152 F.3d 169, 173 (2d Cir.1998) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Further, courts are required to read complaints generously, drawing all reasonable inferences from the complaint's allegations in favor of the plaintiff. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). Accordingly, a court must deny

a defendant's motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *In re Emex Corp. Sec. Litig.*, No. 01 Civ. 4886(SWK), 2002 WL 31093612, at *4 (S.D.N.Y. Sept.18, 2002) (*quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

## VII. APPLICABLE STATUTE(S) OF LIMITATIONS

The Court must determine what statute of limitations governs each of MSBI's securities claims. To satisfactorily resolve the statute of limitations issues, the Court must (potentially) make two determinations: 1) The date on which this consolidated class action was filed for purposes of Sarbanes–Oxley; and if that date is post-July 30, 2002, 2) The scope of Sarbanes–Oxley's application.

### A. This Action Was Filed on September 16, 2002

■ By its terms, Section 804 applies to "all proceedings addressed by this section that are commenced on or after the date of enactment of this Act [July 30, 2002]." 28 U.S.C. § 1658(b). Thus, if this consolidated class action was commenced prior to July 30, 2002, Section 804's expanded limitations period is inapplicable.

AOLTW contends that, for purposes of determining the applicability of Section 804, this consolidated class action was commenced on July 18, 2002, the date the first of several now-consolidated class actions were filed. *See* Reply Memorandum of Law in Support of the AOL Time Warner Defendants' Motion to Dismiss the Amend-

ed Consolidated Class Action Complaint, dated November 14, 2003, at 4 ("AOLTW Reply"). In response, MSBI argues that since its complaint as lead plaintiff was filed on September 16, 2002, seven weeks after the passage of Sarbanes–Oxley, that Section 804's expanded limitations period applies.[6]

The issue of when this consolidated class action was commenced is surprisingly complex. It creates the potentially anomalous outcome of punishing plaintiffs who filed too early, a proposition counter to the basic understanding of a statute of limitations. In addition, it is highly unlikely, if not a virtual certainty, that this issue will not present itself again; in other words, there are no plaintiffs at this point who will file cases prior to July 30, 2002, and thus be outside the scope of Section 804. While it is true that in most cases, class actions or otherwise, the date of the first filing is the operative one for statute of limitations purposes, such a result in this case is both inequitable and impractical.

First, from a constitutional perspective, it is hard to imagine that an overzealous and careless plaintiff, could, by filing 12 days prior to the effective date of Sarbanes–Oxley's expanded protections for securities plaintiffs, bind an entire nation of purchasers of AOL securities to a statute of limitations that was against the interests of the entire class. Second, even if there were no potential due process problems, practically speaking, if the Court were to determine that July 18, 2002 was the operative date for statute of limitations purposes (and thus the § 10(b) claims based on oral statements made over 3

---

**6.** In contending that the initial file date of July 18, 2002 date is irrelevant, MSBI relies on *In re IPO*, 241 F.Supp.2d 281. However, because *In re IPO* involved only one individu-al plaintiff filing a complaint to which the defendants did not raise a statute of limitations defense, that decision is of limited use.

years ago were barred), no rational plaintiff would choose to remain in that class.[7] Because the Court will not bind an entire class to a statute of limitations that is flatly contrary to its interests, and because, as a practical matter, a commencement date of July 18, 2002 would create all of the procedural headaches that the JPML was trying to avoid when it consolidated these cases, the Court finds that this consolidated class action was filed on September 16, 2002.[8] Accordingly, Section 804 of Sarbanes–Oxley applies.

### B. Sarbanes–Oxley Applies to MSBI's § 10(b) Claims

■ Having determined that the date this action was commenced for Section 804 purposes was September 16, 2002, the Court turns to the question of whether Section 804 applies to all, some, or none of the claims asserted by MSBI. Pursuant to Section 804, the threshold requirement for the application of Sarbanes–Oxley's expanded limitations period is that the right of action "involves a claims of fraud, deceit, manipulation, or contrivance." If the underlying securities claim does not involve a fraud-based claim, then Section 804's expanded limitations period is inapplicable.

In its motion to dismiss the Amended Complaint, Defendant AOLTW contends that claims under §§ 11, 12(a)(2) and 15 of the Securities Act must be brought within one year of the discovery of the alleged misstatement or omission, and, in any event, within three years of the relevant public offering or sale. *See* 15 U.S.C. § 77m. The defendant also asserts that "a similar limitations period" applies to claims under §§ 10(b), 14(a), and 20 of the Exchange Act. AOLTW Memo at 11.

Lead Plaintiff MSBI opposes AOLTW's interpretation of the effect of Sarbanes–Oxley on the statutes of limitations in this case. MSBI contends that Sarbanes–Oxley expanded the statute of limitations on all its claims.

There is little doubt that Section 804's expanded statute of limitations applies to § 10(b) claims. *See In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 431, 442 (S.D.N.Y.2003). *See also Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F.Supp.2d 243, 265 (S.D.N.Y.2003). Indeed, this is a rather non-controversial proposition; Section 804 expressly states that it applies to "claims sounding in fraud." The question of whether Section 804 applies to MSBI's other claims is less clear, but because MSBI concedes (*See* MSBI Opp. at 23, n 11) that as a practical matter, the expanded Sarbanes–Oxley statute of limitations only affects its Section 10(b) claims (and the related 20(a) control person claims), it is unnecessary to reach that question. In any event, Section 804 applies here, and MSBI's § 10(b) claims based on alleged misstatements prior to July 18, 1999 are timely.

---

**7.** This, of course, assumes that there would still be time for these plaintiffs to file a timely complaint.

**8.** Contrary to AOLTW's characterization of MSBI's position as "absurd and disingenuous," a finding that this action was filed on September 16, 2002 is consistent with the Lead Plaintiff provisions of the PSLRA. *See* 15 U.S.C. § 78u–4(a)(3)(B). In appointing MSBI Lead Plaintiff, the Court determined, pursuant to 15 U.S.C. § 78u–4(a)(3)(B), that MSBI was "most capable of adequately representing the interests of the class members." To now hold that MSBI, the party "most capable" of representing the class, was bound by a statute of limitations that was against the Class' interest, would be inconsistent both with the PSLRA and this Court's previous determination that MSBI was the most suitable party to serve as Lead Plaintiff.

## VIII. AN AOLTW INVESTOR OF "ORDINARY INTELLIGENCE" WOULD NOT HAVE BEEN AWARE OF THE PROBABILITY THAT SHE HAD BEEN DEFRAUDED PRIOR TO JULY 18, 2002

Post–Sarbanes–Oxley, claims based on "fraud, deceit, manipulation or contrivance" must be brought within "2 years after the discovery of the facts constituting the violation" or within "5 years after such violation." 28 U.S.C. § 1658. The two-year limitations period commences after the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir.1992). This type of notice is referred to as inquiry notice.

■ A plaintiff is on inquiry notice when sufficient information is available to "suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 (2d Cir.1993). *See also Levitt v. Bear Stearns & Co.,* 340 F.3d 94, 101 (2d Cir.2003). Under such circumstances a duty of inquiry arises, and if the plaintiff fails to make a diligent inquiry into the possibility of fraud, the limitations period runs from the date of inquiry notice. *See id.* The circumstances giving rise to the duty to inquire are referred to as "storm warnings." *See Levitt,* 340 F.3d at 101. The financial information that triggers the storm warnings "must be such that it relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants."

*Newman v. Warnaco Group, Inc.,* 335 F.3d 187, 193 (2d Cir.2003). An investor does not, however, "have to have notice of the entire fraud being perpetrated to be on inquiry notice." *Dodds,* 12 F.3d at 351–52. In order to trigger the duty to inquire, the wrongdoing suggested by the storm warnings "must be probable, not merely possible." *Warnaco,* 335 F.3d at 193. Further, even when "storm warnings" might indicate the probability of fraud, a plaintiff is not on inquiry notice if the company's management provides words of comfort to temper the "storm warnings." *LC Capital Partners, LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 155 (2d Cir.2003). It should be noted, however, that words of comfort prevent the duty to inquire "only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." *Id.*

While the question of inquiry notice is typically inappropriate at the motion to dismiss stage, if the facts needed to make the determination "can be gleaned from the complaint and papers integral to the complaint, resolution of the issue on a motion to dismiss is appropriate." *Id.* at 156. However, "[d]efendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law. Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct." *Warnaco,* 335 F.3d at 194 (*quoting Nivram Corp. v. Harcourt Brace Jovanovich, Inc.,* 840 F.Supp. 243, 249 (S.D.N.Y.1993)). *See also In re Chaus Sec. Litig.,* No. 88 Civ. 8641(SWK), 1990 WL 188921, at *5 (S.D.N.Y.1990).[9]

---

9. Some examples of such "uncontroverted evidence" in the Second Circuit are: 1) When there were 3 substantial reserve charges in increasing amounts within four years, *LC Capital,* 318 F.3d at 155; and 2) When disclosures of the financial wrongdoing were contained in the company's prospectuses, *Dodds,* 12 F.3d at 351.

Here, AOLTW contends that, through a series of news articles, press releases, and SEC filings of transactions with Sun Microsystems ("Sun"), Hughes Electronics ("Hughes"), and Gateway, as well as vendor advertising deals and advertising/equity deals generally, MSBI was on notice of the allegedly overstated A & C revenue on or before July 18, 2001. AOLTW Memo at 13.[10]

MSBI argues that its duty to inquire was triggered no earlier than July 18, 2002, when the first of two *Washington Post* articles was published and the SEC and DOJ began their investigations into AOLTW. MSBI Opp. at 26. Against the backdrop of this Circuit's jurisprudence on inquiry notice, and for the reasons set forth below, the Court agrees with the plaintiff. No duty to inquire was triggered prior to the publication of the July 18, 2002 *Washington Post* article.

### A. The Sun, Hughes and Gateway Transactions Are Insufficient to Trigger Plaintiff's Duty to Inquire

■ In its motion to dismiss, AOLTW contends that a series of transactions between the Company and Sun, Hughes and Gateway (and the accompanying press releases) from November 1998 through October 1999 were sufficient to trigger the plaintiff's duty to inquire. AOLTW claims that these press releases "make clear that AOL was investing in Hughes [and Gateway] and Hughes [and Gateway] [were] agreeing to buy advertising from AOL." AOLTW Memo at 14–15. The Court agrees with AOLTW that the Sun, Hughes and Gateway transactions "make clear" that the companies were engaging in mutually beneficial contracts; however, the notion that 3 agreements to buy advertis-

ing (none of which so much as mention the Company's accounting for those transactions) "suggest to an investor of ordinary intelligence the probability that she has been defrauded" is seriously off the mark. In fact, it is hard to imagine that any reasonable investor would have read the 1998 and 1999 press releases regarding these deals as anything other than the Company doing exactly what it was supposed to be doing; *i.e.*, engaging in legitimate transactions that would ultimately create value for shareholders.

### B. The Vendor Advertising and Equity Deals Are Also Insufficient to Trigger Plaintiff's Duty to Inquire

The defendants argue that a series of articles from April 16, 2001 through July 12, 2001 "provided notice of all of the vendor deals alleged in the Amended Complaint to have been improper." AOLTW Memo at 15. More specifically, the defendants refer to an April 16, 2001 article in *The Wall Street Journal* titled "Amid Advertising Slowdown, AOL Parlays Partnerships Into Revenue," in which one of AOL's partners was quoted as saying, "They are getting increased revenue from us, and we're getting better rates from them ... There is money going both ways, yes." *Id.* at 15. AOLTW claims that "this article put MSBI on notice no later than April 2001 of exactly the kind of advertising deals alleged in the Amended Complaint to have resulted in overstated revenue and backlog." *Id.*

Again, AOLTW is correct: the April 16, 2001 *Wall Street Journal* article definitively put investors, including MSBI, on notice that AOLTW was entering deals and "parlay[ing] partnerships into revenue." What

---

10. News articles, press releases and SEC filings may be considered on a motion to dis-

miss. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002).

befuddles the Court, however, is AOLTW's extrapolation that "parlay[ing] partnerships into revenue" suggests to an investor of ordinary intelligence the probability that she has been defrauded. Indeed, throughout its motion to dismiss, AOLTW conflates notice of the existence of a transaction now alleged to be fraudulent with notice that such transactions were, *ex-ante*, being fraudulently accounted for. In addition to the April 16, 2001 *Wall Street Journal* article, none of the other articles/reports cited by the defendants (including those in *Advertising Age, Fortune, BusinessWeek Online, Thomas Weisel Partners* [11] and the October 23, 2001 *Wall Street Journal*) come anywhere close to establishing the probability of fraud sufficient to trigger inquiry notice-in fact, the articles amount to little more than affirmations of AOLTW's "continued success at signing large advertising deals." *Id.* at 16. There is simply no plausible basis for holding that notice of large advertising deals, even if such deals were "unusual," constitutes "uncontroverted evidence that irrefutably demonstrates fraudulent conduct." [12]

MSBI's stance, that no duty to inquire was triggered prior to July 18, 2002, best comports both with this Circuit's precedent and common sense. On July 18, 2002, *The Washington Post*, a national publication with a weekly circulation of over five million,[13] ran the first of two articles based on statements of former Company employees and confidential documents, which reported that AOLTW and AOL artificially inflated AOL's advertising revenue.[14] Within two weeks of *The Washington Post's* article, the SEC and DOJ commenced civil and criminal investigations into AOLTW. MSBI Opp. at 26. Finally, on August 14, 2002, the Company, in an SEC filing, stated for the first time that it "may" have overstated A & C revenue by $49 million. *Id.*

Because the duty to inquire is triggered only when the wrongdoing suggested by the storm warnings is "probable, not merely possible," the Court finds that an investor of ordinary intelligence would not have been, and should not have been, aware of the probability that she had been defrauded until July 18, 2002, the date of publication of the first article in *The Washington Post*. The fact that the SEC and Justice Department did not launch investigations until 1 week and 2 weeks, respectively, after publication of this article, only bolsters this contention.[15] Put simply, the

---

11. Though the Thomas Weisel Partners report is closer than any of the other examples provided by the defendants to describing the internal accounting at AOL, the report specifically disclaims any potential fraud in stating that AOL's accounting "is not a sinister thing" and that it merely reflects AOL's "muscle as a purchaser." AOLTW Memo at 19.

12. It is difficult to reconcile AOLTW's position in its motion to dismiss, *i.e.*, that investors of ordinary intelligence should have been on notice of alleged accounting improprieties as early as 1998, with its course of conduct prior to the litigation, in which the Company did not even acknowledge the possibility of inflated revenue until August 2002.

13. http://washpost.com /circulation/

14. Notably, in this article, a Company attorney denied the allegations, stating that, "the accounting for all of these transactions is appropriate and in accordance with generally accepted accounting principles." AC ¶ 451. The article also quoted Defendant Ernst & Young as stating that it "stands by its original view that the accounting and disclosures were appropriate." *Id.* Because the plaintiff argues for an inquiry notice date of July 18, 2002, the Court need not reach the question of whether the statements of the Company attorney and Ernst & Young qualify as "words of comfort," though it certainly appears that they do.

15. It is worth noting that even "the service of a sweeping SEC subpoena" has been found to be an "insufficient trigger" of inquiry notice

press releases and financial articles offered by the defendants do not satisfy its "heavy burden" and hardly qualify as storm warnings; on the contrary, a reasonable investor likely would have viewed them as sunny forecasts of a bright and profitable future for AOLTW.[16]

## IX. THE CLAIMS AGAINST THE NEWLY–NAMED DEFENDANTS ARE TIMELY

Defendants contend that the claims against Time Warner, Akerson, Barge, Bollenbach, Cappucio, Caufield, Gilburne, Novack, Raines, Ripp and Schuler do not relate back to the first class action filed on July 18, 2002, and thus for statute of limitations purposes, claims against these defendants were commenced on April 15, 2003, when the Amended Complaint was filed. However, having found that no plaintiff was on notice of the probability of fraud at AOLTW until July 18, 2002, the claims against the newly-named defendants, filed on April 15, 2003, are timely.[17] As such, the Court need not reach the question of whether the claims relate back to any earlier complaint.

## X. BECAUSE THE AMENDED COMPLAINT IS TIMELY, ALLEGATIONS OF TOLLING ARE UNNECESSARY

Because MSBI's duty to inquire did not arise until July 18, 2002, and its complaint was filed on September 16, 2002, within

the statute of limitations, MSBI was under no obligation to allege investigation that would toll the statute of limitations. As such, the argument that MSBI failed to allege any inquiry that might have tolled the statute of limitations is moot.

## XI. MSBI HAS PROPERLY PLED COMPLIANCE WITH THE STATUTE OF LIMITATIONS

Defendant AOLTW asserts that MSBI's Securities Act claims should be dismissed for failure to plead compliance with the statute of limitations. As support for this claim, the defendants rely on *In re Chaus Sec. Litig.*, No. 88 Civ. 8641 (SWK), 1990 WL 188921, at *5 (S.D.N.Y. Nov.20, 1990), which states that a Securities Act complaint must set forth (1) "the time and circumstances of the discovery" of the misstatement, (2) the reasons why the misstatement was not discovered earlier if more than a year has lapsed and (3) "the diligent efforts which the plaintiff undertook in making or seeking such discovery."

While the Court is unsure of the value of *Chaus* when a plaintiff has satisfied the statute of limitations, in the interests of thoroughness, it will apply its analysis. With respect to prong one, the Court is satisfied that MSBI has adequately plead "the time and circumstances of its discovery" of the alleged misstatements. *See generally* MSBI Opp. at 34–35. Because the Court has ruled that MSBI's complaint was filed within a year of inquiry notice,

---

because such a subpoena "does not reveal, by itself, any particular accounting irregularity." *In Re WorldCom*, 294 F.Supp.2d at 447.

**16.** Defendant AOLTW suggests that an application of Sarbanes–Oxley that expands the statute of limitations on the § 10(b) claims "may run afoul of the *ex post facto* clause of the Constitution if ... the limitations period had expired for these defendants before July 30, 2002." AOLTW Memo at 18, n 11. In addition, AOLTW argues that Sarbanes–Oxley

cannot revive previously expired claims. *See* AOLTW Reply at 5. However, in light of the Court's determination that the plaintiff's duty to inquire was not triggered until July 18, 2002, both of these arguments are moot.

**17.** Because they were filed within one year of the date of constructive notice, these claims are timely regardless of whether Section 804 of Sarbanes–Oxley applies.

prongs two and three of *Chaus* are inapposite. Accordingly, to the extent that *Chaus* applies here, MSBI has satisfied its requirements and has properly pled compliance with the statute of limitations.

## XII. THE AMENDED COMPLAINT PLEADS ALLEGED MISSTATEMENTS WITH PARTICULARITY

■ AOLTW claims that because the Amended Complaint does not plead alleged misstatements with sufficient particularity, those claims should be dismissed.[18] Rule 9(b) of the Federal Rules of Civil Procedure states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Under Rule 9(b), "[t]he complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made." *Hollin v. Scholastic Corp., (In re Scholastic Corp. Sec. Litig.)*, 252 F.3d 63, 69–70 (2d Cir. 2001). Similarly, the PSLRA requires a complaint alleging violations of § 10(b) or § 14(a) of the Exchange Act to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading" and, if an allegation is made upon information and belief, "to state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); *see also Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074 (JSM), 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003). Exchange Act claims that fail to satisfy these PSLRA pleading requirements must be dismissed. *See* 15 U.S.C. § 78u–4(b)(3)(a).

Recently, the Second Circuit held that the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud. *Rombach v. Chang*, 355 F.3d 164 (2d Cir.2004). In clarifying, the court stated:

> Fraud is not an element or a requisite to a claim under Section 11 or Section 12(a)(2); at the same time, claims under those sections may be-and often are-predicated on fraud. The same course of conduct that would support a Rule 10b–5 claim may as well support a Section 11 claim or a claim under Section 12(a)(2). So while a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b).

*Rombach*, 355 F.3d at 171.

As a threshold matter, and pursuant to *Rombach*, the Court must determine whether the Section 11 and Section 12(a)(2) claims asserted by MSBI are predicated on fraud; if they are, then the plaintiff is obligated to satisfy the heightened pleading standard. *Rombach* provides some guidance on this issue. In *Rombach*, the plaintiff asserted that its Section 11 claims did not "sound in fraud." *Id.* at 171–72. The Second Circuit nonetheless found that the claims were fraud-based because "the wording and imputations of the complaint are classically associated with fraud: that the Registration statement was 'inaccurate *and* misleading;' that it contained 'untrue statements of material facts:' and that 'materially *false* and *misleading* statements' were issued." *Id.* (emphasis in original). *Rombach* also quoted approvingly from *In re Ultrafem Secs. Litig.*, 91 F.Supp.2d 678 (S.D.N.Y. 2000), which applied Rule 9(b) where

---

**18.** AOLTW concedes that the Amended Complaint has satisfied the particularity requirements of Rule 9(b) and the PSLRA with respect to the alleged overstated revenue associated with Bertelsmann, Veritas, Wembley and Ticketmaster.

"plaintiffs [made] little, if any, effort to differentiate their asserted negligence claims from the fraud claims which permeate the Complaint ... [and] merely disavow[ed] any allegations that would make Rule 9(b) applicable ... without specifying the allegations that would support a negligence cause of action." *In re Ultrafem,* 91 F.Supp.2d at 690–91.

Here, MSBI asserts, first in the Amended Complaint, again in its Opposition Memorandum, and finally in a letter to the Court dated January 28, 2004 ("MSBI Letter"), that its Section 11 and Section 12(a)(2) claims are not based in fraud. MSBI argues that these claims are set forth in a separate "non-fraud based section of the Complaint and in separate non-fraud based counts." MSBI Letter at 1. MSBI also states that those sections of the Complaint "do not even mention the word fraud and the Complaint specifically disavows that any of the Section 11 claims rely on allegations of fraud." MSBI Letter at 2.

Despite its disclaimer, the Court, pursuant to *Rombach,* finds that MSBI's Section 11 and Section 12(a)(2) claims are fraud-based. There is no mention in any of the allegedly non-fraud based counts (¶¶ 631–655, 680–703) of the prongs of a negligence cause of action; *i.e.,* duty, breach, causation, and damages. Indeed, the pertinent paragraphs of the Amended Complaint contain almost all of the same fraud-based buzzwords that *Rombach* held were sufficient to trigger the heightened pleading requirements of Rule 9(b) and the PSLRA.

For example, the Amended Complaint repeatedly refers to "false and misleading statements and omissions of material fact" (AC ¶ 631), and "untrue and misleading financial statements" (AC ¶ 642). As such, the Court finds that MSBI's Section 11 and Section 12(a)(2) claims are fraud-based, and Rule 9(b)'s heightened pleading standard applies to those claims. Accordingly, plaintiff's Section 11 and Section 12(a)(2) claims, because they "sound in fraud," must be pled with particularity.[19]

While it is undisputed that Rule 9(b) and the PSLRA command a higher level of pleading than non-fraud claims, it is important to note that a complaint is not, and should not be, held to the same standard as would be necessary to prevail at trial. After all, "Rule 9(b) is intended to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Acito v. IMC-ERA Group,* 47 F.3d 47, 52 (2d Cir.1995). By contrast, Rule 9(b) is not intended to be "a vehicle by which potentially meritorious claims are to be driven out of court because the plaintiff has failed to allege facts that he can only obtain through taking discovery that he has thus far been denied." *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1124 (S.D.N.Y.1982).

## A. Allegedly Overstated A & C Revenue

■ MSBI alleges that AOLTW improperly accounted for a bundling arrange-

---

19. The parties' opportunism on this issue is hard to miss. Both MSBI and AOLTW's positions on what type of claim(s) "sound in fraud" seem to be dictated not by legal principles, but rather, by legal expediency. For example, in an effort to circumvent Sarbanes-Oxley's expanded limitations period on securities claims, AOLTW argues that MSBI's Section 11 and Section 12(a)(2) claims "do not sound in fraud." AOLTW Reply at 6. However, when it comes to applying a heightened standard of pleading, AOLTW vociferously argues that Section 11 and Section 12(a)(2) "sound in fraud" and are thus subject to Rule 9(b)'s particularity requirements. MSBI's position on what constitutes "fraud," though the inverse of AOLTW's, is equally disingenuous.

ment with Gateway Computers by improperly booking revenue from the Gateway arrangement on a gross basis. AOLTW counters that MSBI's allegation regarding the Gateway transaction is conclusory and insufficient to satisfy the heightened pleading standard of the PSLRA.[20] *Id.* at 23.

In the Amended Complaint, MSBI contends that on or about late 1999 or early 2000, AOL and Gateway entered into an agreement whereby each time a Gateway computer purchaser subscribed to AOL, Gateway would receive a fee or "bounty" from AOL ("Gateway Roundtrip/Free Internet Service"). AC ¶ 176. According to an April 2, 2003 *Washington Post* article entitled "Gateway to Amend Financial Reports–SEC Had Raised Concerns Over AOL Deal," at the same time AOL paid a "bounty," Gateway in turn paid AOL for providing a free year of internet service on its computers. *Id.* The Amended Complaint alleges that "since there was no substance to this transaction other than swapping checks, AOL should have reported the transaction at its zero value instead of improperly reporting the amounts as sales and corresponding costs of sales." *Id.* According to MSBI, as a result of the transaction, AOL overstated its advertis-

ing revenue by $340 million in 2000 and $130 million in 2001. *Id.* ¶ 177.

MSBI further alleges, with the support of an article in *The Washington Post*, that Gateway was forced to restate its revenue from the AOL agreement. *Id.* ¶ 178. In sum, the Amended Complaint contains the date of the transaction at issue, the amount of the allegedly overstated revenue, preliminary details of the accounting for the transaction, and a basis for believing the accounting may have been fraudulent. The Court concludes that this is sufficient information to satisfy Rule 9(b)'s heightened pleading requirement and thus "provide[s] the defendant with fair notice of plaintiff's claim." Indeed, to hold otherwise would require securities plaintiffs to produce information at the pleading stage to which they have no access because of the PSLRA's mandatory discovery stay.[21]

For the same reasons that the Gateway Roundtrip transaction is satisfactorily pled, *i.e.*, it contains specific information regarding the amount of the transaction, its date and a preliminary explanation as to why the accounting was fraudulent, the transactions with the Golf Channel (AC ¶ 246), Homestore (AC ¶¶ 141–156, 192–

---

**20.** In contesting the lack of particularity of the pleadings, AOLTW states that the Amended Complaint is inadequate because all it does is "describe[] the transaction based on publicly-available sources, cite[] some accounting rules that might apply to the transaction and then allege[], in conclusory fashion, that AOLTW's accounting for the transaction was wrong." AOLTW Memo at 23. Given the fact that MSBI is precluded from any securities-related discovery by virtue of the PSLRA discovery stay, the Court wonders what information MSBI's Complaint could be based upon, if not publicly available information. Indeed, if publicly available information were insufficient to satisfy Rule 9(b)'s particularity requirement, then, in light of the PSLRA's mandatory discovery stay, no securities case could ever survive the motion to dismiss.

**21.** That one of the articles cited by MSBI contains a quote by an AOL spokesperson denying that AOL accounted for the Gateway transaction on a gross basis is immaterial for the particularity inquiry. *See* AOLTW Memo at 23–24. What matters for the particularity inquiry is whether the plaintiff has provided enough information to provide fair notice to the defendant and establish that the suit is not improvident—which, with respect to all of the transactions except eBay, MSBI has. Further, given the amount of revenue AOLTW has already restated, the 1999 and 2000 statements of Company spokespeople on accounting issues do not appear to be entitled to much credence.

199),[22] DrKoop.com (AC ¶¶ 239–240), Gateway Inc. Stock Purchase (AC ¶¶ 200–02), Hughes Electronics (AC ¶¶ 186–191), Catalina Marketing Corporation and Telefonica SA (the "jackpotting" transactions) (AC ¶¶ 212–220), Monster.com (AC ¶¶ 209–211), Oxygen Media (AC ¶¶ 203–06), Purchase-Pro (barter arrangements and warrants) (AC ¶¶ 207–08, 232–34), Qwest (AC ¶¶ 183–185), Sun (AC ¶¶ 157–160) and Worldcom (AC ¶¶ 180–182) are also pled with particularity.[23]

With respect to the eBay transaction that MSBI contends was fraudulently accounted for (AC ¶¶ 229–230), the Court finds that this transaction is not pled with particularity. The Amended Complaint refers only to "an agreement with the internet auction company," but makes no mention of when this agreement was consummated or what its terms were. In order to provide fair notice to the defendant, that information is required. Accordingly, the transaction between AOL and eBay is not sufficiently particularized to form the basis of any of plaintiff's claims.

### B. The Sections 11 and 12(a)(2) Claims Based On the Merger Registration Statement Are Also Pled with Particularity

MSBI's Section 11 and Section 12(a)(2) claims are pled with particularity. The Amended Complaint identifies the untrue AOL financial statements and AOL Time Warner pro forma financial statements, as well as AOL representations and warran-

ties, that were incorporated into the Merger Registration Statement. *See* AC ¶¶ 634–655. The Amended Complaint also provides specific reasons why plaintiff believes these statements were false or misleading, including, for example, the material overstatement of AOL advertising and commerce revenue, backlog and percentage increases in year over year comparisons (AC ¶¶ 107–140, 157–160); the material overstatement of the real value and useful life of goodwill (AC ¶¶ 413–424, 447); and the misrepresentation that the financial statements were prepared in accordance with GAAP and GAAS and fairly represented the results of AOL's operations (AC ¶¶ 264, 269, 275, 276, 283, 605–630). In sum, with respect to the claims based on the Merger Registration Statement, the Amended Complaint adequately identifies the "statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent." *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 69–70.

### XIII. WITH THE EXCEPTIONS NOTED BELOW, THE SECTION 10(B) CLAIMS ARE NOT DISMISSED

■ A private plaintiff may only bring suit under Rule 10b–5 for acts prohibited by the text of § 10(b). *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). There are three principle rules promulgated under Section 10(b): Rule 10b–5(a), 10b–5(b), and

---

**22.** Of note, the Court counts 24 paragraphs in the Amended Complaint (AC ¶¶ 141–156, 192–199) devoted exclusively to describing the transactions between AOL and Homestore that the defendants contend have not been pled with particularity.

**23.** Though the Court will discuss the details of some of the alleged improper transactions

throughout this Opinion, it will not do so here. At this point, it is adequate to indicate that the Gateway deal serves a template for numerous other deals in which AOL allegedly bartered with other companies, round-tripping money and reporting advertising revenue at greatly inflated values.

10b–5(c). Rule 10b–5(a) prohibits any person, directly or indirectly, from employing "any device, scheme or artifice to defraud" in connection with securities purchases or sales. 17 C.F.R. § 240.10b–5. Rule 10b–5(b) prohibits misstatements and omissions in connection with securities purchases and sales. *Id.* Rule 10b–5(c) prohibits persons from engaging "in any act, practice or course of business which operates or would operate as fraud or deceit upon any person" in connection with securities purchases or sales. *Id.*

### A. MSBI May Proceed Under Rules 10b–5(a) and (c) [24]

In its Reply, AOLTW suggests that MSBI cannot proceed under rules 10b–5(a) and 10b–5(c) because, in order to allege a claim under those subsections that is not based on misstatements or omissions, a plaintiff must allege manipulative acts, "something it has not done." AOLTW Reply at 22. In support of this contention, the defendants rely on *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 473–74, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). In *Santa Fe,* the Supreme Court remarked that "manipulation," for the purposes 10b–5, "refers generally to *practices,* such as wash sales, matched orders, or rigged prices, that are *intended to mislead investors* by artificially affecting market activity." *Id.* at 476, 97 S.Ct. 1292 (emphasis added). Here, according to the defendants, since the Amended Complaint does not allege that the Company defendants engaged in "wash sales, matched orders, or rigged prices," plaintiff should be precluded from proceeding under Rules 10b–5(a) and (c). AOLTW Reply at 22. Defendant's position is without merit.

First, the *Santa Fe* list of manipulative practices is clearly not exhaustive; 10b–5(a) and (c) claims need not contain the magic words "wash sales, matched orders, or rigged prices" to be valid. Second, both 10b–5 and *Santa Fe* contemplate manipulation of the securities markets to be practices, acts, misstatements or omissions designed to mislead investors. If, as the 308–page Amended Complaint alleges, the defendants in fact "engaged in a systemic scheme for more than 3½ years to inflate AOL's reported advertising revenue by at least $1.7 billion based on various sham transactions and accounting improprieties," then there can be little doubt that investors have been very seriously misled by the defendants' acts. Accordingly, plaintiff is permitted to proceed under both Rules 10b–5(a) and (c).

### B. It is Axiomatic that a Claim Under Section 10(b) Must Allege Facts Giving Rise to a Strong Inference of Fraudulent Intent

■ To establish liability under Section 10(b), a complaint must, as a threshold matter, allege sufficient scienter. *See SEC v. U.S. Envtl., Inc.,* 155 F.3d 107 (2d Cir. 1998). AOLTW argues that MSBI's claims under § 10(b) of the Exchange Act should be dismissed because MSBI has, *inter alia,* not adequately pled scienter. MSBI disagrees, and contends that a strong inference of scienter is adequately pled on its Section 10(b) claims both against the Company and the individual § 10(b) defendants.

To state a claim for fraud under § 10(b) of the Exchange Act, a complaint must allege facts giving rise to a strong inference of fraudulent intent for each defendant. *See, e.g., Shields v. Citytrust Ban-*

---

**24.** Of course, MSBI may also proceed under Rule 10b–5(b), though the defendants do not appear to contest this.

*corp Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). "A strong inference of scienter may be established either (a) by alleging facts showing that a defendant had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168–69 (2d Cir.2000). *See also Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir.2000). "Although speculation and conclusory allegations will not suffice, neither [does the Second Circuit] require 'great specificity' provided the plaintiff alleges enough facts to support a 'strong inference of fraudulent intent.'" *Ganino*, 228 F.3d at 169.

### 1. MSBI Has Not Adequately Pled Motive and Opportunity [25]

■ Of the two ways a plaintiff can plead scienter, the first is by adequately alleging motive and opportunity to commit fraud. A plaintiff properly pleads motive when she alleges that "concrete benefits could be realized by one or more of the false statements and wrongful disclosures alleged." *Shields*, 25 F.3d at 1128. To plead opportunity, a plaintiff must allege "the means and likely prospect of achieving concrete benefits by the means alleged." *Id.*

Here, MSBI contends that the Amended Complaint properly pleads that the defendants, as a group and individually, had motive and opportunity to inflate AOL advertising revenue in order to effect the Merger and thereafter make the Merger appear to be a success. MSBI Opp. at 55.

In contrast, AOLTW contends that the Amended Complaint does not sufficiently allege motive and opportunity with respect to any alleged misstatement for any of the AOLTW defendants. AOLTW is correct.

While the Court recognizes that "in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter," *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir.2000) (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993)), the series of generalized allegations offered by MSBI regarding AOL's "obsession" with consummating the Merger are simply not enough to satisfy § 10(b)'s scienter requirement. Indeed, consistent with their fiduciary obligations, it would have been quite odd if the defendants were not "obsessed" with ensuring the success of the Merger. Equally insufficient for establishing motive and opportunity is MSBI's contention that AOL was characterized by a "culture of recklessness and greed" whereby its executives were motivated to "keep their positions of power and access to corporate riches." AC ¶¶ 525–34, 516–517. As AOLTW points out, generalized allegations of greed and a desire for increased executive compensation could be made with respect to any large company. If such generalized allegations of greed were sufficient to satisfy Section 10(b)'s scienter requirement, then claims against any for-profit endeavor would survive the pleading stage simply by alleging that the defendant was in the business of making money—Section 10(b)'s scienter requirement surely commands more.[26]

---

**25.** In *Novak*, the Second Circuit held that, "although litigants and lower courts need and should not employ or rely on magic words such as 'motive and opportunity,' we believe that our prior case law may be helpful in providing guidance as to how the 'strong inference' standard may be met."

**26.** The Court's finding that MSBI has failed to plead motive and opportunity applies not only to the corporate defendants and individual defendants contained in the motion to dismiss filed by AOLTW, but also applies to Defendants Keller, Colburn, Rindner, Case, and Berlow.

## 2. MSBI Has Satisfactorily Pled Conscious Misbehavior or Recklessness With Respect to Some, But Not All, of the Defendants

 Securities plaintiffs can also satisfy § 10(b)'s scienter requirement by adequately alleging strong circumstantial evidence of conscious misbehavior or recklessness. To establish strong circumstantial evidence of scienter, a plaintiff must allege facts establishing "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir.2000). The inference of scienter may arise where the complaint sufficiently alleges that the defendants: "... (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311.

In its opposition to the motion to dismiss, MSBI argues that the Amended Complaint adequately alleges conscious misbehavior or recklessness in "one or more" of the following ways: (1) Defendants were reckless in failing to properly monitor the accounting of AOL advertising revenue, especially in light of the SEC's imposition of a Cease and Desist Order and Defendant Case's promise to the public that AOL would adopt "gold-standard" accounting practices; (2) The restatement of advertising revenue and GAAP violations support a strong inference of scienter; (3) Defendants instilled and maintained a reckless business environment; (4) Whistleblowers, internal company reports, and emergency and regular meet-

ings regarding inflated AOL advertising revenue provided the Defendants with notice of "the true state of AOL"; (5) The Homestore and Purchase Pro transactions show "deliberate illegal behavior"; (6) Defendants' direct involvement in transactions for which AOL advertising revenue was improperly recorded reflects recklessness; (7) The ongoing SEC and DOJ investigations and the SEC's unwillingness to allow the Company to sell securities pursuant to a new securities offering; (8) Individual Defendants' continued denial of wrongdoing in light of their knowledge of improper accounting.

## 3. MSBI Has Adequately Alleged Scienter With Respect to Corporate Defendants AOLTW and AOL

 MSBI has adequately pled scienter on its § 10(b) claims with respect to AOLTW and AOL. The plaintiff has alleged that the Company had internal financial information that showed the Company was at risk to lose $108 million in fiscal year 2001 and $140 million in 2002. AC ¶ 92. Plaintiff further alleges that regular meetings and telephone conferences were held in which issues related to advertising revenue and fraudulent deals were discussed. AC ¶¶ 90–91. Plaintiff also highlights a history of accounting problems at AOLTW by pointing specifically to SEC Cease and Desist Orders. AC ¶¶ 99–106. Finally, plaintiff alleges that no officer or director of AOLTW ever conveyed any of these concerns to the public—in fact, just the opposite—the public and analysts were presented with a picture of AOL as a company "rid[ing] above the normal market dynamics." *Id.* ¶ 364. Because plaintiff has alleged that AOLTW had access to information suggesting that the public statements of its officers were not accurate, because MSBI has established, vis-à-vis SEC Cease and Desist Orders, that AOLTW was on notice of previous ac-

counting improprieties, and because MSBI pled allegedly fraudulent transactions with sufficient particularity, the Court is satisfied that plaintiff has adequately pled scienter with respect to AOLTW.

### 4. MSBI Has Adequately Alleged Conscious Misbehavior or Recklessness, i.e., Scienter, with Respect to Defendants Pittman, Kelly, Pace, Keller, and Colburn, But Not With Respect To Defendants Schuler, Novack, Levin, Parsons, Ripp, Rindner, Berlow, or Case

 The issue of scienter with respect to the individual defendants is more complicated. As a threshold matter, the Court must determine whether plaintiff can rely on the group pleading doctrine. Under the group pleading doctrine, the identification of the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents (*e.g.*, prospectuses) that reflect the collective actions of various individuals directly involved in the day-to-day affairs of the corporation. *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999). While it is true, as MSBI contends, that this Court has previously indicated that "nothing in the PSLRA has altered the group pleading doctrine," *In re Emex Corp. Sec. Litig.*, No. 01 Civ. 4886, 2002 WL 31093612, at *7–*8 (S.D.N.Y. September 18, 2002), a closer examination of *Emex* reveals that it does not stand for the proposition that group pleading, or "clumping," in the context of Section 10(b) claims is always permissible. For example, in *Emex* this Court did permit plaintiffs to "rely on a presumption that the statements in the prospectuses, registration statements ... or other group-information are the collective works of those individuals;" however, scienter was deemed adequate only "[b]ased upon detailed pleading in the Complaint as to the Individual Defendants' roles." *Id.* There is no reason to depart from *Emex* in this case.[27] With respect to group-published documents such as prospectuses, plaintiffs may rely on a presumption that the group-information is the collective works of those individuals; however, with respect to the oral statements of individuals, group pleading is impermissible. As such, the scienter inquiry with respect to the individual defendants will be assessed on a case-by-case basis.[28]

#### a. Robert W. Pittman

Plaintiff alleges that Robert Pittman, as Chief Operating Officer of AOL and Co–Chief Operating Officer of AOLTW, was privy to all significant financial and operational information at the two companies. AC ¶ 475. Plaintiff alleges that Pittman admitted to being the "Account Executive" on the biggest accounts and that Pittman noted, with regard to cross-media advertising deals, "we generally do these issues at the COO or CEO level within the Compa-

---

27. In addition to *Emex*, the post-PSLRA trend in this Circuit is to disallow group pleading. *See e.g., Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97 Civ. 3374, 1999 WL 101772, at *17 (S.D.N.Y. Mar.1, 1999) (quoting *ESI Montgomery Cty., Inc. v. Montenay Int'l Corp.*, No. 94 Civ. 0119, 1996 WL 22979, at *4 (S.D.N.Y. Jan. 23, 1996)).

28. Of the individual defendants named in the Amended Complaint, MSBI has only brought § 10(b) claims against Stephen M. Case, Robert W. Pittman, J. Michael Kelly, David M. Colburn, Myer Berlow, Barry Schuler, Kenneth J. Novack, Eric Keller, Gerald M. Levin, Wayne H. Pace, Richard D. Parsons, Joseph A. Ripp and Steven Rindner. Among these defendants, Case, Colburn, Berlow, Keller, and Rindner have filed separately, but each has raised an issue with respect to the adequacy of the scienter allegations against them.

ny." *Id.* ¶ 480. Further, plaintiff contends that Pittman was informed in a series of meetings by at least one employee that AOL was "living on revenue that was not of the highest quality." *Id.* ¶ 501. Plaintiff has pled that AOL tracked on a weekly basis the health of the dot-coms, how much they owed AOL, what AOL was doing to get its money, how the dot-coms were responding and how much money AOL could lose if the dot-coms did not pay their bills. *Id.* ¶ 550. In addition, the Amended Complaint alleges that internal Company documents indicated that AOL was "at risk" to lose more than $108 million in advertising revenue in fiscal 2001 (July 2000 to June 2001). *Id.* ¶ 553. The Amended Complaint specifically alleges that approximately two weeks before AOL released its first quarter results on October 18, 2000, Pittman was told that AOL faced the risk of losing more than $140 million in advertising revenue in calendar year 2001. *Id.* ¶ 554. Plaintiff has also pled the occurrence of weekly "emergency meetings" to discuss advertising arrangements with failing dot-coms. *Id.* ¶ 555.

Against the backdrop of the foregoing knowledge, it is alleged that Pittman actually "touted the strength of AOL's advertising and commerce revenues," responding to a question about a slowdown in advertising by stating, "I don't see it and I don't buy it." *Id.* ¶ 557. Pittman also stated, "In the advertising world, you hear people say there's a slowdown. But it's not across the board." *Id.* ¶ 335. On January 31, 2001, Pittman claimed, "We are seeing exciting momentum in our subscription and advertising/commerce businesses across the company." *Id.* ¶ 340. On

March 8, 2001, Pittman asserted, "Our businesses are doing great. I want to assure you we gave The Street our guidance and we are sticking to it. Period."

Given the allegedly stark contrast between Pittman's knowledge and Pittman's public statements, the Court is satisfied that plaintiff has adequately pled that Pittman "knew facts or had access to information suggesting that [his] public statements were not accurate; or failed to check information [he] had a duty to monitor." *Novak*, 216 F.3d at 311.[29] Accordingly, plaintiff has adequately pled scienter with respect to Defendant Pittman and the Section 10(b) claim against him is not dismissed.

### b. J. Michael Kelly

■■■ Michael Kelly served as Executive Vice President and Chief Financial Officer for AOLTW and Senior Vice President and Chief Financial Officer for AOL. According to the Amended Complaint, Kelly was the executive "most directly responsible for the adequacy of the Company's accounting." *Id.* ¶ 477. It is alleged that Kelly signed off on all of AOL and AOLTW's major advertising deals and its financial reports until December 2001. *Id.* It is further alleged that Kelly was a member of the Operating Committee ("Op Com"). According to the Amended Complaint, the Operating Committee, which consisted of nine members of senior management, met weekly. As a result of these meetings, it is alleged that members of the Operating Committee knew about the "BA Specials," the restructuring of advertising deals for failing dot-coms, and the downturn in AOL's advertising business. *Id.* ¶ 474.

---

29. When coupled with the alleged discrepancy between his knowledge and his public statements, Pittman's sales of AOL securities only add to the inference of scienter. During the Class Period, Pittman sold over 3,300,000 shares of AOL and AOLTW stock for proceeds of over $262 million. *Id.* ¶ 567. In the four months following the Merger, Pittman sold 1,500,000 shares for over $72 million in proceeds. As of January 31, 2002, Pittman owned just 13,388 shares of AOLTW stock. *Id.*

According to the plaintiff, despite his knowledge of AOL and AOLTW's burgeoning advertising woes, Kelly claimed, "Strong growth in subscription and advertising revenues will drive the Company's performance ... AOL Time Warner has all the financial strength necessary to back our vision for the future." *Id.* ¶ 342. Kelly, in an October 18, 2000 conference call, characterized AOL's advertising and commerce revenue growth as "very healthy ... I can't say that strongly enough." *Id.* ¶ 321.

As is the case with Defendant Pittman, Plaintiff has adequately alleged that Defendant Kelly "knew facts or had access to information suggesting that [his] public statements were not accurate." *Novak,* 216 F.3d at 311. As a member of the Operating Committee [30] and as the executive most responsible for the Company's accounting, it can certainly be inferred that Kelly knew of the Company's emerging advertising issues; yet, his public statements conveyed no such concern—in fact, just the opposite. In addition, by pleading Kelly's intimate involvement with the allegedly fraudulent advertising deals, MSBI has satisfied its obligations under Rule 10b–5(a) and (c). Accordingly, scienter is properly pled with respect to Kelly,[31] and the Section 10(b) claim against him is not dismissed.

### i. Kelly's Statements Do Not Qualify for Protection Under Either the "Bespeaks Caution" Doctrine or the PSLRA Safe Harbor

 AOLTW argues that claims based on allegedly false and misleading oral statements by defendants Kelly and Levin are forward-looking statements accompanied by sufficient cautionary language to qualify for protection under the "safe harbor" provisions of the PSLRA, 15 U.S.C. §§ 77z–2 & 78u–5, and the "bespeaks caution" doctrine, and therefore should be dismissed. AOLTW claims that the recent decision in *Rombach* bolsters this contention. Plaintiff disagrees.

Forward-looking statements are defined as projections, plans, or statements of future economic performance. 15 U.S.C. § 78u–5(i)(1). *See also Credit Suisse First Boston v. ARM Fin. Group, Inc.,* No. 99 Civ. 12046(WHP), 2001 WL 300733, at *5 (S.D.N.Y. March 28, 2001)(stating that "forward-looking statements are contingent statements as to future events"). "It is well recognized that even when an allegedly false statement 'has both a forward-looking aspect and an aspect that encompasses a representation of present fact,' the safe harbor provision of the PSLRA does not apply." *In re Nortel Networks Corp. Sec. Litig.,* 238 F.Supp.2d 613, 629 (S.D.N.Y.2003) (quoting *In re APAC Teles-*

---

**30.** The Court notes that had plaintiff only alleged that Kelly was a senior executive, actively involved in Company management, such an allegation would be insufficient, on its own, to plead scienter. *See In re Health Mgmt. Sys. Inc. Sec. Litig.,* 97 Civ. 1865, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998). However, it is not simply Kelly's role as a senior executive that plaintiff has pled; instead plaintiff has alleged that as a member of the Operating Committee and a signatory of major advertising deals, Kelly was exposed to information that indicated the advertising and commerce situation at AOL and AOLTW was much bleaker than his public statements conveyed.

**31.** Though the Court does not reach the question of whether, standing alone, Kelly's stock sales are sufficient to establish a strong inference of scienter, when considered alongside the alleged discrepancy between private knowledge and public statements, the stock sales are informative. It is alleged that during the Class Period Kelly sold over $42 million in AOL and AOLTW stock. In the three months immediately following the Merger, Kelly sold 400,000 shares for over $19 million in proceeds. *Id.* at ¶ 569.

*ervice, Inc. Sec. Litig.*, No. 97 Civ. 9145(BSJ), 1999 WL 1052004, at *7 (S.D.N.Y. Nov.19, 1999)). Further, "linking future success to present and past performance does not render statements immune from liability." *APAC* at *8.

Under the PSLRA safe harbor, an oral forward-looking statement is not actionable if it is accompanied by a cautionary statement (1) identifying the particular oral statement as forward-looking, (2) stating that the actual results could differ materially from the forward-looking statement and (3) identifying a readily-available written document that identifies factors that might cause actual results to differ materially from the forward-looking statement. *See* 15 U.S.C. §§ 77z–2(c)(2) & 78u–5(c)(2). However, "cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173. *See also In re Prudential Secs. Inc. Ltd. P'ships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y.1996)("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

AOLTW contends that the statements attributed to Michael Kelly in ¶ 321 of the Amended Complaint, that AOL's advertising and commerce revenue growth was "very healthy," and "I can't say that strongly enough," are forward-looking. *Id.* ¶ 321. It is wrong. The statements are not contingent on future events, nor are they projections about AOL's financial future; rather, they are statements of the Company's existing financial condition. With respect to Kelly's prediction that AOLTW's revenue would rise 12% to 15% annually, because that statement was combined with statements of existing fact, it

too falls outside the scope of the PSLRA safe harbor and the bespeaks caution doctrine. *See APAC*, 1999 WL 1052004, at *8 (holding that "linking future success to present and past performance does not render statements immune from liability"). Furthermore, even if this Court had concluded that Kelly's statements were forward-looking, because MSBI has adequately pled that Kelly either knew or recklessly disregarded the true financial condition of AOL when he spoke publicly, *see supra* at 221–22, the statements would not be entitled to the protections of the safe harbor or the bespeaks caution doctrine. After all, "no degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made." *Milman* 72 F.Supp.2d at 231. That is, the disclaimer at the beginning of the October 18, 2000 conference call that the statements that would follow were "subject to a number of factors and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements," is insufficient to invoke the safe harbor since MSBI has adequately alleged that such statements were made with conscious or reckless disregard for the true financial condition of the Company.

### c. Barry Schuler

■ Prior to the Merger, Schuler was President of Interactive Services at AOL. After AOL and Time Warner merged, Barry Schuler became Chairman and Chief Executive Officer of the AOL subsidiary of the Company. *Id.* ¶ 479. The Amended Complaint states that a former account manager in the account services unit of AOL's Interactive Marketing division stated that for big advertising deals, Berlow, Schuler or Pittman "signed off." *Id.* ¶ 480. It is also alleged that Schuler was a member of the Operating Commit-

tee and thus knew about the "BA Specials," the restructuring of advertising deals for failing dot-coms, and the downturn in AOL's advertising business. *Id.* ¶ 474. Further, on April 16, 2001, Schuler stated, "We're renting out the eyeballs and increasingly the fingers of our subscribers, who are primed to buy products as a result of the adjacency, context and product-information surfing the AOL service lends itself to." *Id.* ¶ 150. This is the only allegedly false and misleading statement in the Amended Complaint attributed to Schuler. Quite simply, the statement is insufficient to form the basis of a Section 10(b) claim. By all accounts, AOL was "renting out the eyeballs" of its subscribers; as such, nothing about Schuler's statement was false or misleading. Further, plaintiff's allegations that Schuler might have "signed off" on all major advertising deals and that Schuler was part of a Company-wide effort to artificially inflate AOL and AOLTW's stock price are not adequate to sustain a 10(b) claim against Defendant Schuler for alleged violations of Rules 10b–5(a) and (c). According to the Amended Complaint, it is only possible that Schuler "signed off" on the allegedly fraudulent deals. The mere possibility (in this case approximately 33%) that Barry Schuler "signed off" on a deal is insufficient to establish scienter. As a result, MSBI's Section 10(b) claim against Schuler is dismissed.

#### d. Kenneth J. Novack

Kenneth Novack was a Vice Chairman and Director of AOL who became Vice Chairman of AOLTW after the Merger. According to the Amended Complaint, Novack provided strategic counsel and handled special assignments for the Chairman, assumed a leading role in major corporate transactions including Bertelsmann, and was a key architect of the Merger. AC ¶ 485. Notably, the Amended Complaint does not contain any specific allegations regarding Novack's knowledge of the alleged problems with AOL and AOLTW's advertising revenue. Nor does the Amended Complaint contain any statements made by Novack that are alleged to have been false or misleading. Although the Amended Complaint does allege that Novack sold 700,000 shares of AOLTW for proceeds of $33 million in the four months following the Merger, against the backdrop of the otherwise minimalist pleadings against Novack, those sales are not enough to support a strong inference of scienter. As such, the Section 10(b) claim against Defendant Novack is dismissed.

#### e. Gerald Levin

Gerald Levin was Chairman and Chief Executive Officer of Time Warner and Chief Executive Officer of AOL Time Warner. According to the plaintiff, Levin had access to all corporate information possessed by the two companies and overruled internal efforts to disclose the true nature of the Company's advertising revenues. *Id.* ¶ 486. There is, however, nowhere that the Court can find, any allegation of Levin's specific knowledge of the alleged deficiencies in the advertising revenue. Thus, MSBI has not adequately alleged Levin's knowledge. Alleging "access to all corporate information of both companies" is materially indistinguishable from alleging officer status, which, pursuant to *In re Health Mgmt.*, 1998 WL 283286, at *6, is insufficient. Further, even if MSBI had established Levin's knowledge of advertising shortfalls, neither the statements attributed to Levin, nor any of the alleged acts committed by Levin, are manipulative or deceptive within the meaning of Section 10(b). Accordingly, plaintiff's allegations against Defendant Levin are inadequate to establish a strong inference of scienter and

the Section 10(b) claim against Levin is therefore dismissed.[32]

### f. Wayne H. Pace

█ Since November 2001, Pace has served as Executive Vice President and Chief Financial Officer of AOLTW. The Amended Complaint alleges that Pace has overseen all of the Company's finance functions, including tax, financial planning, mergers and acquisitions, treasury, accounting and capital allocation and that he approved all major AOL advertising deals. *Id.* ¶ 484. Plaintiff also alleges that Defendant Pace, in Company press releases, continued to misrepresent to investors critical information relating to advertising revenue with full knowledge that investors were relying heavily on such information. *Id.* ¶ 500. Plaintiff points specifically to a July 24, 2002 conference call with market analysts in which Pace allegedly overstated advertising and commerce revenue by $126 million. *Id.* ¶¶ 405–407. Pursuant to *Novak,* and in light of allegations that Pace not only approved all of AOL's advertising deals, but personally oversaw all of the Company's finance functions, the Court concludes that plaintiff has adequately alleged that Pace "knew facts or had access to information suggesting that [his] public statements were not accurate." Accordingly, the Section 10(b) claims against Pace may proceed.

### g. Richard Parsons

Richard Parsons was a Director and President of Time Warner and a Director, Chief Executive Officer and Co–Chief Operating Officer of AOL Time Warner. *Id.* ¶ 487. The Amended Complaint alleges that in that role, Parsons was privy to all information regarding the Company's operations including the Business Affairs division. The Amended Complaint then alleges that despite this "access to the truth," Parsons made misrepresentations denying the accounting improprieties of the Company. *Id.* Such conclusory allegations of knowledge are not sufficient to establish scienter with respect to Parsons; in fact, they amount to little more than alleging Parsons' officer status, which under *In re Health Mgmt.,* 1998 WL 283286, at *6, is insufficient, on its own, to plead scienter.[33] The Section 10(b) claim against Parsons is dismissed.

### h. Joseph Ripp

Joseph Ripp was Executive Vice President and Chief Financial Officer of AOL, Inc., the online subsidiary of AOL Time Warner. It is alleged he had access to and was involved with financial matters relevant to the transactions. *Id.* ¶ 482. It is specifically alleged that Ripp managed the Homestore transactions on behalf of the Company. *Id.* During mid-to late June 2001, Ripp allegedly voiced his concerns about AOLTW's ability to collect money from third parties to representatives of Homestore. According to the Amended Complaint, Ripp thus "clearly knew the details of the deals," but covered up that knowledge to allow the Com-

---

32. Having already determined that the statements of Gerald Levin are not actionable based on the allegations in the Amended Complaint, it is unnecessary to reach the question of whether Levin's statements are forward-looking and thus entitled to protection under the "bespeaks caution" doctrine and the PSLRA safe harbor.

33. Even when the April 2001 sale of 700,000 AOLTW shares by Parsons is combined with his status as an officer, the Court does not believe that a strong inference of scienter arises, absent allegations that Parsons had specific information, or was exposed to specific information that suggested AOL's advertising revenue was not what it seemed and either made public statements that contradicted or omitted that information or engaged in manipulative or deceptive acts.

pany to inflate advertising revenue. *Id.* ¶¶ 148–153. The Court disagrees. The Amended Complaint does not establish that Defendant Ripp had knowledge of the nature of the allegedly fraudulent deals, but merely establishes that he participated on a telephone call where, *inter alia,* certain aspects of the deal were discussed. Conclusory allegations are not sufficient to establish that a defendant acted recklessly or with conscious misbehavior. *Ganino,* 228 F.3d at 169. As a result, the Section 10(b) claim against Ripp is dismissed.

### i. Eric Keller

■■■ Eric Keller was a Senior Vice President in the Business Affairs Division at AOL and it is alleged that he was deeply involved in the creation of the Company's advertising transactions, including the Homestore and PurchasePro stock warrant deals. AC ¶ 481. In the section of the Amended Complaint devoted to pleading scienter, it is alleged that Keller was the architect of sixteen separate sham transactions with Homestore in which the two companies generated bogus advertising revenue through the use of three-legged "round-trip" deals involving third parties. *Id.* ¶ 493. In the first leg of the deal, Homestore paid a third-party for services and products that Homestore did not need, and for which it in fact, overpaid. *Id.* ¶ 143. The second, or secret leg required the third-party to purchase advertising from AOLTW with most or all of the money Homestore paid to the third party. *Id.* The Amended Complaint alleges that Keller and Colburn agreed with Homestore executives not to document the secret leg of these transactions in order to avoid detection. *Id.* ¶ 493.[34] Finally, under the third leg, AOLTW purchased ad-

vertising from Homestore in the same amount that the third-party paid to AOLTW for advertising. *Id.* ¶ 143. Accordingly, AOLTW and Homestore allegedly secretly round-tripped or purchased advertising revenue from themselves in sham triangular transactions. *Id.* ¶ 143. MSBI also alleges that once these deals were in effect, Keller worked with a representative of Homestore to avoid detection by Homestore's auditing firm of these deals. *Id.* ¶ 493.

Certainly, if proven, MSBI's allegations regarding Keller's involvement in the Homestore transaction would establish that Keller's conduct was "highly unreasonable," and "an extreme departure from the standards of ordinary care." *In re Carter–Wallace,* 220 F.3d at 39. However, Keller argues that MSBI's Section 10(b) claim cannot proceed against him because "plaintiffs do not identify any statements actually made by Mr. Keller." Defendant Eric Keller's Memorandum of Law in Support of His Motion to Dismiss Plaintiff's Consolidated Amended Class Action Complaint (Counts Six and Eighteen), dated July 14, 2003, ("Keller Memo"), at 6. The Court agrees with Keller that there are no false or misleading statements in the Amended Complaint attributable to him, and thus there is no basis for liability under Rule 10b–5(b), which prohibits misstatements and omissions in connection with securities purchases or sales. 17 C.F.R. § 240.10b–5.

The lack of false statements notwithstanding, Keller's alleged involvement in numerous allegedly fraudulent acts is undeniable. Such acts are plainly adequate to plead a claim under Rule 10b–5(c), which the Court has already established as permissible. As stated previously, Rule

---

**34.** The Amended Complaint also alleges that Keller was involved with the PurchasePro transaction in which AOL received Purchase-Pro stock warrants in exchange for distributing PurchasePro software. AC ¶ 496.

10b–5(c) prohibits persons from engaging "in any act, practice or course of business which operates or would operate as fraud or deceit upon any person" in connection with securities purchases or sales. 17 C.F.R. § 240.10b–5. If, as plaintiff alleges, Keller "agreed with Homestore executives not to document the secret leg of these transactions in order to avoid detection," then he has engaged in a prohibited act as defined by Rules 10b–5(a) and (c). Accordingly, the Court finds that MSBI has properly pled scienter with respect to Defendant Keller.

Keller also moves to dismiss the claims against him on the following grounds: (1) Keller is not subject to Section 11 liability; and (2) Plaintiff's Section 10(b) claim is time-barred by the applicable statute of limitations. Keller Memo at 6.

### i. Keller is Not Subject to Section 11 Liability

Section 11 of the Securities Act imposes liability for false statements contained in a registration statement upon four classes of persons: (1) signers of the registration statement, (2) directors of the issuer, (3) professionals who prepared or certified any part of the registration statement, and (4) the underwriters of the offering. 15 U.S.C. § 77k(a). Defendant Keller, however, does not fit into any of the four § 77k(a) classes of persons; as a result, the Section 11 claim against Keller is dismissed.[35]

### ii. The 10(b) Claim is Timely

The Court has already determined that all of MSBI's claims against AOLTW, AOL, Time Warner and the individual defendants included in the AOLTW Memo are timely since no investor of ordinary

intelligence would have been aware of the probability that she had been defrauded prior to July 18, 2002. *See supra* at 209–12. Accordingly, Keller's statute of limitations arguments "adopt[ed] by reference" from the AOLTW Memo are not persuasive.

Keller also argues, however, that when AOL placed him on administrative leave on June 19, 2001, and some articles in the press "commented that Mr. Keller's suspension was made in connection with AOL's investigation into its business partnership with PurchasePro," MSBI's duty to inquire was triggered with respect to its claims against Keller. This is not a reasonable interpretation of this Circuit's inquiry notice jurisprudence. "Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct." *Warnaco*, 335 F.3d at 194. The Company's decision to place Keller on administrative leave, even when accompanied by some speculative press reports linking the suspension to PurchasePro, is simply not uncontroverted evidence that irrefutably demonstrates that Keller had committed fraud; indeed, it is nowhere close, as Keller's suspension could have been for numerous non-fraudulent reasons. As such, the Section 10(b) claims against Defendant Keller are not time-barred.

### j. Steven Rindner

Steven Rindner was a Senior Vice President in AOL's Business Affairs and Development division who reported directly to David Colburn. It is alleged that he "took over handling the sham transactions with Homestore on behalf of the Company." AC ¶ 482. It is also alleged that

---

**35.** Counsel for MSBI has also apparently conceded this point, both explicitly (through communications with counsel for Keller) and im-

plicitly (through the omission of Keller in its listing of Registration Statement signatories in MSBI Opp. at 37, n. 28).

Rindner participated in a telephone call with Homestore's Chief Executive Officer, Stuart Wolff, in which Rindner confirmed that Eric Keller had left the Company and sought confirmation from Homestore that the third party vendors would make payments to AOL. AC ¶ 150. Additionally, the Amended Complaint alleges that although Rindner "clearly knew the details of the deals," he covered up that knowledge to allow the Company to inflate advertising revenue and avoid adverse publicity. AC ¶ 152. The Amended Complaint contains no allegations that Rindner was reckless or engaged in conscious misbehavior with respect to the Homestore transaction. The allegations with respect to Defendant Rindner are conclusory and thus insufficient to establish scienter. *See Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir.2001) ("A plaintiff cannot base securities fraud claims on speculation and conclusory allegations."). Accordingly, the Section 10(b) claim against Defendant Rindner (AC Count 18), the only claim in the Amended Complaint against him, is dismissed.

### k. Myer Berlow

Myer Berlow was President of AOL's Worldwide Interactive Marketing Division in the Business Affairs Department. Following the Merger, in August 2001 he became President of the Global Marketing Solutions Group. In September 2002, Berlow became a Senior Advisor to the Company. AC ¶ 36(g). The Amended Complaint alleges that Berlow was a member of both the Operating Committee and the so-called "Friends of Bob [Pittman]" Group. AC ¶ 478. The Amended Complaint alleges that by at least August 2000,

Berlow knew that various advertising customers of the Company were experiencing financial problems that jeopardized existing AOL advertising agreements. AC ¶ 318. Plaintiff also alleges that for big advertising deals, Berlow, Schuler, or Pittman signed off. AC ¶ 480. The Amended Complaint does not, however, indicate any one specific deal for which Berlow "signed off." The Amended Complaint also refers to a March 8, 2002 e-mail sent by Berlow to Barry Schuler. The e-mail was regarding Robert O'Connor, a former AOL employee who had allegedly warned senior executives of accounting problems at AOL. In the e-mail, Berlow wrote, "[t]he only reason you know that there is an inventory problem is that Bob [O'Connor] continued up the ladder with the inventory problem (Bobby–Ripp–Kelly–Mayo) and shot his career out the window." AC ¶ 504. According to the Amended Complaint, Berlow summed up by stating, "I have no need to be right only a desire to see my stock go up." AC ¶ 505.

Put simply, even when all of plaintiff's allegations against Berlow are pooled, neither conscious nor reckless misconduct is established. There are no false and misleading statements in the Amended Complaint attributed to Berlow,[36] nor are there any alleged manipulative and deceptive acts.[37] MSBI's failure to plead scienter with respect to Berlow is fatal to its Section 10(b) claim against him. Having failed to plead scienter for an underlying 10(b) claim, the plaintiff also cannot establish the requisite "culpable participation" for Section 15 and 20 claims. *See infra* at 77–82. As such, all claims in the Amended

---

**36.** Indeed, the e-mail Berlow sent regarding the reason for Robert O'Connor's dismissal and his desire for an increased stock price appears to be true. Moreover, the statement was not made publicly, and thus could not have been relied upon by shareholders.

**37.** The possibility that Berlow "signed off" on a hypothetical advertising deal is plainly insufficient to qualify as an alleged scheme or a deceptive act under Rules 10b–5(a) and (c).

Complaint against Myer Berlow are dismissed.

### *l.* **David Colburn**

 From 1995 until the Merger, David Colburn was Senior Vice President of Business Affairs for AOL. Following the Merger, Colburn became Executive Vice President and President of Business Affairs and Development for AOL Time Warner. In both roles, Colburn reported directly to Robert Pittman. The Amended Complaint alleges that Colburn was a member of the Operating Committee and that he reviewed and signed off on all deals. AC ¶ 476. The Amended Complaint also delineates Colburn's involvement in numerous advertising transactions and bases its Section 10(b) claims against Colburn, at least in part, on that involvement.

Colburn moves to dismiss the Section 10(b) claims against him for failure to plead scienter, contending that MSBI has not alleged either motive or opportunity to commit fraud or conscious misbehavior or recklessness. Memorandum of Law in Support of Defendant David M. Colburn's Motion to Dismiss the Amended Consolidated Class Action Complaint, dated July 14, 2003 ("Colb. Memo"), at 26. While the Court agrees that MSBI has failed to adequately allege that Colburn had the motive and opportunity commit fraud, the Court finds that MSBI has adequately pled that Colburn consciously misbehaved. The Court's finding is premised on Colburn's involvement with the Veritas transaction.[38]

MSBI alleges that in September 2000, AOL negotiated a deal with Veritas Software Corporation ("Veritas") in which AOL agreed to pay Veritas $50 million in return for only $30 million worth of software. According to the Amended Complaint, the extra $20 million was then round-tripped back to AOL in a purported separate deal in which Veritas purchased online advertising from AOL. AC ¶ 161. MSBI bases this allegation on a former Senior Contract Official at AOL. *Id.* According to the Amended Complaint, it was Defendant Colburn, along with Business Affairs Director, Jeffrey Tyeryar, who instructed AOL personnel to raise the contract amount to $50 million and then structure another deal in which Veritas would spend the extra $20 million it had received for its software on AOL advertising. AC ¶ 162. This arrangement made it appear as if there were two wholly unrelated transactions. The Amended Complaint alleges that the deal, which MSBI's source alleges was a "kick-back" arrangement in violation of APB 29, was structured this way so that the extra $20 million could be booked as revenue before the end of the last quarter of calendar year 2000, the last quarter before the Merger. *Id.*

In response, Colburn contends that the allegations regarding the Veritas transaction are insufficient because there are no allegations that Colburn "either withheld the details of the deal from the Company's accountants or participated in decisions concerning the accounting for the transaction." Colb. Memo at 28. Colburn misses the point. It is the very structure of the deal, not what Colburn did or did not tell the AOL accountants, that matters. If in fact Colburn engineered a separate trans-

---

**38.** In light of the Court's determination that MSBI's allegations regarding Colburn's involvement in the Veritas transaction are sufficient to support a finding of scienter, an in-depth analysis of Colburn's alleged involvement with Homestore is unnecessary. However, a preliminary review of those transac- tions suggests that the Court could have just as easily based its finding of scienter with respect to Colburn on his involvement in the Homestore deals. The transactions between AOLTW and Homestore are discussed in detail *supra* at 226.

action to make it appear that AOL was receiving $20 million in advertising revenue, when in actuality it was giving itself its own money, then Colburn has acted fraudulently. In addition, the absence of a false or misleading statement attributable to Colburn does not inoculate him from Section 10(b). As the Court has previously determined, potential liability under Section 10(b) can be premised on violation of any of the rules promulgated under the section. Rule 10b–5(c) prohibits any person, directly or indirectly, from engaging "in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(c). By specifically alleging Colburn's engineering of a "kickback" arrangement with Veritas, MSBI has adequately alleged that: (1) Colburn acted with fraudulent intent; and (2) Colburn engaged in conduct prohibited by Section 10(b). Accordingly, the Court will not dismiss MSBI's Section 10(b) claims against Defendant David Colburn.

In addition to its Section 10(b) claims, MSBI has also brought claims against Colburn under Section 11 (AC Count 6) and Sections 15 and 20 (AC Counts 12–13, 20). With respect to Count Six of the Amended Complaint, which alleges that Defendant Colburn is liable as a signatory of the registration statements of AOLTW in 2001 and 2002, that claim is dismissed as to Defendant Colburn. In addition to the fact that Colburn's failure to sign those registration statements precludes holding him liable, Lead Plaintiff MSBI has conceded that Count Six of the Amended Complaint mistakenly included Colburn (much like it mistakenly included Keller). Colb. Memo at 5.

Finally, for the reasons set forth *infra* at 233–35, the Court will not dismiss the Sections 15 and 20 claims against Colburn.

### m. Stephen M. Case

Stephen M. Case co-founded AOL in 1985. Case served as Vice President of Marketing from September 1985 to September 1987 and as Executive Vice President from September 1987 until January 1991. Case became a Director of AOL in September 1992, Chief Executive Officer in April 1993 and Chairman of the Board in October 1995, holding all of these positions until the Merger was consummated on January 11, 2001.

According to the Amended Complaint, Case, as Chairman of AOL Time Warner, had access to all significant corporate information possessed by the two companies. AC ¶ 473. In addition, the Complaint alleges that all of the key participants in the transactions at issue reported either directly or indirectly to Case. *Id.* Plaintiffs also allege that Case had the authority to "sit in" on the Operating Committee's meetings, though notably, plaintiffs do not allege that Case ever participated in such a meeting. Despite its protestations to the contrary, MSBI has simply failed to allege that Stephen Case knew that the A & C revenue stream was considerably more imperiled than was being reported to shareholders and the public. As was true with Defendant Levin, plaintiff's allegation that Case, by virtue of his position, had "access" to all significant corporate information is insufficient; indeed, such an allegation is materially indistinguishable from alleging officer status. *See In re Health Mgmt.,* 1998 WL 283286, at *6. Further, although the Court has concluded that MSBI adequately pleaded that members of the Operating Committee were provided with information suggesting that the Company's advertising situation was precarious,

Plaintiff never alleges that Case actually attended any of the Operating Committee's meetings, only that he had the authority to sit in. This is insufficient. As a result, MSBI has not adequately pled scienter with respect to Defendant Case.

Even if, however, MSBI had adequately pled that Case had knowledge of the advertising situation, none of the statements or actions attributed to Case in the Complaint are sufficient to create potential liability under any of the subsections of 10(b). For example, the Amended Complaint attributes the following allegedly fraudulent statements to Case: (1) on January 11, 2000, in response to a question regarding the Merger, Case told *The Los Angeles Times* that "one of the creative breakthroughs was in the valuation" AC ¶ 95; and (2) in early 1997, Case promised that AOL would adopt "new gold-standard accounting practices." AC ¶ 100. Finally, the Amended Complaint contains a statement by a longtime business associate of Case's, John Malone, that "Case was ready to marry anybody that would have had hard assets and liquidity." AC ¶ 537. None of these statements is false, misleading, or in any way fraudulent. In addition, unlike David Colburn and Robert Pittman, both of whom engineered deals that were allegedly fraudulent, there is no indication in the Amended Complaint that Case engaged in any manipulative or deceptive conduct. The Court refuses to indulge MSBI's invitation to infer Case's scienter from the fact that executives who reported to Case (both directly and indirectly) may have engaged in fraudulent behavior. In sum, MSBI's Section 10(b) claim against Defendant Stephen Case does not adequately plead scienter; accordingly, those claims are dismissed. The failure to plead scienter with respect to Case is also fatal to MSBI's Sections 15 and 20 control person claims (*see infra* at 233–35); as such,

those claims against Case are also dismissed.

## XIV. THE SECTIONS 10(B) AND 14(A) CLAIMS ADEQUATELY PLEAD LOSS CAUSATION

AOLTW argues that MSBI's claims under §§ 10(b) and 14(a) of the Exchange Act should be dismissed because MSBI has not adequately pled loss causation. To state a claim under §§ 10(b) and 14(a) of the Exchange Act, a plaintiff must plead loss causation, that is, the plaintiff must demonstrate that "the economic harm that it suffered occurred as a result of the alleged misrepresentations." *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1495 (2d Cir.1992). However, a plaintiff satisfies §§ 10(b) and 14(a)'s loss causation requirement by demonstrating that "defendant's misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of the transaction." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87 (2d Cir. 2001). *See also Emex*, at *8 (finding that plaintiff's allegations that "defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of Emex at the time of the transaction . . . [were] sufficient to survive a motion to dismiss.").

Here, Defendant contends that Plaintiff's economic harm was not a result of the alleged misrepresentations, but rather the product of intervening external forces, such as the marketwide decline in Internet stocks and the fallout from the September 11 terrorist attacks. AOLTW Memo at 43. In response, MSBI argues that it has adequately pled loss causation by alleging that during the Class Period, defendants' actions artificially propped up the price of AOL and AOLTW securities when they were purchased, exchanged or

otherwise acquired by MSBI class members, causing MSBI and the Class to lose billions of dollars. AC ¶ 16. MSBI is right. That is, in conformity with the *Suez* standard on loss causation, the Amended Complaint quite clearly alleges losses caused by a disparity between the transaction price and the true investment value of AOL and AOLTW. As such, loss causation is properly pled and the motion to dismiss on that ground is denied.[39]

## XV. AOLTW'S ARGUMENTS IN SUPPORT OF DISMISSAL OF THE SECTION 14(A) CLAIMS ARE UNPERSUASIVE

AOLTW argues that MSBI's claims under § 14(a) of the Exchange Act against AOL and the former AOL defendants should be dismissed because the officers and directors of one party to a merger cannot, as a matter of law, be deemed to have solicited the proxies of the shareholders of the other party to the merger. *See Del Noce v. Delyar Corp.*, No. 72 Civ. 1819-CLB, 1976 WL 813, at \*24 (S.D.N.Y. July 30, 1976) (holding that the CEO of one merger partner could not be deemed to have solicited the proxies of the other partner's shareholders). Plaintiff disagrees, contending that Section 14(a) imposes liability on any person who solicits

or permits the use of his name to solicit a proxy. 15 U.S.C. § 78n.

■ The Court will not dismiss MSBI's 14(a) claims against AOL and the former AOL defendants. The only authority cited by defendants in support of dismissal, *Del Noce*, 1976 WL 813 at \*24, did not involve a joint proxy statement, which this case does. In fact, the Form S–4 Registration statement at issue here, *i.e.*, the Joint Proxy Statement, contained both AOL and Time Warner's logos, contained identical information regarding the date and time for the shareholders to vote on the proposed merger (June 23, 2000 at 10:00 a.m.), and was signed by the Chairman and Chief Executive Officers of both AOL and Time Warner, Stephen Case and Gerald Levin, respectively. *See* Butler Decl. Ex. 37. Given the unmistakably cooperative nature of the Joint Proxy Statement, and given the inapplicability of *Del Noce*, the Court concludes that there is no basis upon which to dismiss the § 14(a) claims.

## XVI. MSBI'S CLAIMS UNDER SECTION 12(A)(2) BASED ON THE BOND OFFERINGS ARE DISMISSED AS TO AOLTW AND THE INDIVIDUAL DEFENDANTS

For the reasons set forth in pages 104–112 of this Opinion and Order, MSBI's

---

**39.** The Court received a letter, with numerous attachments, dated March 12, 2004, from counsel for AOLTW on the issue of loss causation. According to the defendants, a matter currently before the United States Supreme Court, *Dura Pharmaceuticals, Inc. et al. v. Broudo et al.*, No. 03–932, is directly relevant to AOLTW's motion to dismiss on the issue of loss causation. After a careful and thorough review of the entire submission, it becomes clear that the defendant's principal argument is that *Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir.2003), is the controlling authority on loss causation in the Second Circuit. *See* AOLTW Letter, dated March 12, 2004, at 2. According to

*Emergent Capital,* "if the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established. *But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."* *Emergent Capital,* 343 F.3d at 197 (emphasis added). The Court agrees with the defendants—*Emergent Capital* controls. Thus, defendants will have every opportunity at trial to prove that the decline in AOLTW stock was caused by September 11, 2001, its aftermath and generalized market conditions; AOLTW will not, however, have that opportunity now. At this stage, plaintiff has satisfied its obligation under *Suez* to plead loss causation.

Section 12(a)(2) claims are dismissed with prejudice.

## XVII. MSBI'S SECTION 11 CLAIMS BASED ON THE BOND REGISTRATION STATEMENT (COUNTS FIVE AND SIX) ARE DISMISSED AS TO AOLTW AND THE INDIVIDUAL DEFENDANTS [40]

AOLTW contends that MSBI's claims under Section 11 of the Securities Act based on the Shelf Registration Statement should be dismissed because MSBI has not adequately alleged an injury in fact by demonstrating that it suffered a loss from its April 2001 and April 2002 bond purchases. AOLTW is correct. Because the failure to allege "injury in fact" deprives the Court of subject matter jurisdiction, AOLTW's motion to dismiss Counts Five and Six is granted.[41]

## XVIII. MSBI'S SECTIONS 15 AND 20 CLAIMS FOR CONTROL PERSON LIABILITY ARE DISMISSED WITH RESPECT TO SOME, BUT NOT ALL OF THE INDIVIDUAL DEFENDANTS

Defendant AOLTW argues that MSBI's claims based on control person liability under Section 15 of the Securities Act and Section 20 of the Exchange Act, (AC Counts 12–13, 20), should be dismissed. AOLTW contends that the Amended Complaint does not adequately allege primary violations by the individual defendants, as the Second Circuit requires. Additionally, the defendants claim that the Amended Complaint does not contain any particular-ized allegations of conscious misbehavior, recklessness or any other culpable participation by any of the individual defendants. In response, plaintiff asserts that, regardless of whether "culpable participation" is a requirement for control person claims, it has properly pled control person liability under both Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

Since Section 15 of the Securities Act and Section 20 of the Exchange Act are substantially the same, *see supra* at 205–06, the Court considers the analysis of each section interchangeable. *HB Holdings Corp. v. Scovill,* Inc. No. 88 Civ. 7983(SWK), 1990 WL 37869, *7 (S.D.N.Y. Mar. 26, 1990). *See also Index Fund, Inc. v. Hagopian,* 609 F.Supp. 499, 510 (S.D.N.Y.1985). Thus, to withstand a motion to dismiss either a § 15 or a § 20(a) claim, plaintiffs must allege: (1) an underlying primary violation by the controlled person; (2) control over the controlled person; and (3) particularized facts as to the controlling person's culpable participation in the fraud perpetrated by the controlled person. *In re Enterprise Mortgage Acceptance Co., LLC Sec. Litig.,* MDL Doc. No. 1495, at 61 (relating to *TIAA v. EMAC,* No. 02 Civ. 2237, *ING v. EMAC,* No. 02 Civ. 2369, *Northern Life v. EMAC,* No. 02 Civ. 2941), dated November 5, 2003 (*citing SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996)). *See also Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) ("[A] determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability.") [42]

---

**40.** This includes AOLTW and defendants Levin, Kelly, Barge, Caulfield, Parsons, Pittman, Novack, Akerson, Bollenbach, Gilburne, Raines, Schuler, Ripp, Cappuccio and Pace.

**41.** For a more thorough explanation of plaintiff's failure to plead injury in fact, *see infra* at 245–46.

**42.** Despite some District Court opinions to the contrary, the Second Circuit has yet to

Although Sections 15 and 20(a) share the similarities noted above, they differ with respect to the alleged primary violation. In this case, the Section 15 claims are premised on violations of Sections 11 and 12(a)(2), while the Section 20(a) claims are premised on violations of Section 10(b). The control person liability claims against the individual defendants, much like the scienter inquiry for the § 10(b) claims, must be assessed on a case-by-case basis.

As stated earlier, the first element for a control person claim, be it a Section 15 or a Section 20(a) claim, is a primary violation. The Court has already determined that MSBI has adequately alleged a primary violation by AOLTW of Section 10(b) and Section 11. Accordingly, MSBI has satisfied the first prong of both its Section 15 and Section 20(a) control person claims.

The second element of a § 15 or § 20(a) claim is control. Control can be demonstrated "by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise." *First Jersey*, 101 F.3d at 1472–73. Stock ownership is not the only means of exercising control pursuant to Sections 15 and 20(a). Other means include business relationships, interlocking directors, family relationships, and the power to influence and control the activities of another. *See Baxter v. A.R. Baron & Co.*, 1996 WL 709624, at *6 (S.D.N.Y. Dec.10, 1996). However, at the motion to dismiss stage, plaintiffs "need only plead facts supporting a reasonable inference of control." *Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452, 484 (S.D.N.Y.2001). "A short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required." *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 415–16 (S.D.N.Y. 2003) (*citing Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

▮ Of the individual defendants, only Berlow and Colburn contest control.[43] The Court finds Colburn's arguments unpersuasive. The Complaint alleges that Colburn had "direct and supervisory involvement in the day-to-day operations of AOL and AOL Time Warner." AC ¶ 818. The Complaint also alleges that because of Colburn's positions "of control and authority as a senior officer and directors of AOL and/or AOL Time Warner, Colburn was able to, and did, control the contents of the Merger Registration Statement and Bond Registration Statement and Prospectus Supplements thereto which contained materially false financial information and omitted facts." AC ¶ 752. Because MSBI has provided "a short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person," the Court finds that control is adequately pled with respect to Colburn.

---

eliminate the culpable participation requirement for control person claims. Until the Second Circuit does so, this Court will continue to assume that an adequately pled control person liability claim contains specific allegations of culpable participation. For a more thorough discussion of the current status of the culpable participation requirement in the Second Circuit, *see In re Enterprise Mortgage Acceptance Co., LLC, Sec. Litig.*, MDL Doc.

No. 1495, at 62, fn 12 (relating to *TIAA v. EMAC*, No. 02 Civ. 2237, *ING v. EMAC*, No. 02 Civ. 2369, *Northern Life v. EMAC*, No. 02 Civ. 2941), dated November 5, 2003.

**43.** Berlow's arguments on control, however, *need not be addressed given plaintiff's failure* to establish scienter, *i.e.*, culpable participation, with respect to Defendant Berlow.

The final element of a control person claim is culpable participation. With respect to the Section 20(a) claims (AC Count 20), although it is not entirely clear exactly what the "culpable participation" requirement commands, allegations of scienter necessarily satisfy the requirement. *Emex,* 2002 WL 31093612, at *10. Therefore, based on the Court's earlier findings, MSBI has satisfied the culpable participation requirement with respect to Defendants Pittman, Kelly, Pace, and Colburn. As such, the Section 20(a) claims against those four defendants may proceed. However, MSBI has not adequately pled scienter with respect to Defendants Case, Levin, Novack, Parsons, Schuler, Berlow, and Ripp. Accordingly, the Section 20(a) claims against Case, Levin, Novack, Parsons, Schuler, Berlow, and Ripp (AC Count 20) are dismissed.

With respect to the Section 15 claims, the Amended Complaint premises liability on violations of Section 11 (AC Count 12) and Section 12(a)(2) (AC Count 13). As a threshold matter, Count 13 is dismissed in its entirety. Having found that MSBI has not adequately pled a primary violation of 12(a)(2), it follows, that there can be no secondary liability for the same underlying conduct. Count Twelve is dismissed as against Case, Levin, Novack, Parsons, Schuler, Berlow, and Ripp. With respect to each of these individual defendants, MSBI has failed to adequately plead scienter, thereby precluding it from pleading culpable participation. The Section 15 claims against Pittman, Kelly, Colburn and Pace, given the adequacy of the scienter allegations against each of these defendants, are not dismissed.

## XIX. ERNST & YOUNG'S MOTION TO DISMISS IS GRANTED IN PART AND DENIED IN PART

Ernst & Young, joined as a defendant in this action, is a firm of certified public accountants that maintains its headquarters in the Southern District of New York. AC ¶ 47. At all times relevant to this action, E & Y provided auditing and accounting services to AOL and AOLTW, including but not limited to, conducting audits of AOL and AOLTW's year-end financial statements and, beginning no later than the quarter ended March 31, 2000, reviewing AOL's and the Company's quarterly financial statements. *Id.* In connection therewith, Ernst & Young issued unqualified audit reports related to AOL and AOLTW's financial statements, for inclusion in each of AOL's annual reports for fiscal years 1999 and 2000 and transition period ended December 31, 2000 on SEC Forms 10–K, in the Merger Registration Statement and the Bond Registration Statement. *Id.* Ernst & Young also issued an unqualified audit report for inclusion in AOLTW's annual report for the years 2000 and 2001 on SEC Forms 10–K and in the Bond Registration Statement. *Id.* According to the Amended Complaint, the alleged financial fraud at AOL and AOLTW could not have been accomplished without the knowing participation of Ernst & Young, who received millions of dollars in auditing, consulting and other fees from the companies. AC ¶ 25. The Complaint further alleges that as the longstanding auditor of AOL and Time Warner, and after the Merger, AOLTW, Ernst & Young had knowledge of, or recklessly disregarded the fraudulent accounting practices and schemes engaged in by AOL and AOLTW during the Class Period, and lent its considerable reputation and credibility to AOL and AOLTW's financial statements. *Id.* ¶ 26. Allegedly, those financial statements were materially misstated starting in 1998 through and including 2002, as a direct result of false advertising revenue that Ernst & Young allowed AOL and AOLTW to recognize. *Id.*

Specifically, Lead Plaintiff MSBI asserts four claims against Ernst & Young: (1) Count 3 alleges that E & Y violated Section 11 of the Securities Act by making false and misleading statements in the 6/30/99 AOL opinion, included in the Merger Registration Statement; (2) Count 7 alleges that E & Y violated Section 11 of the Securities Act by making false and misleading statements in audit reports included in the Bond Registration Statement; (3) Count 16 alleges that E & Y violated Section 14(a) of the Exchange Act by making materially false and misleading statements in the 6/30/99 AOL Opinion included in the Proxy Statement; and (4) Count 19 alleges that E & Y violated Section 10(b) by making materially false and misleading statements in each of the audit reports described above. Ernst & Young moves to dismiss all four counts against it.

### A. The Section 11 Claim Based on the Bond Registration Statement (Count 7) is Dismissed With Prejudice

For the reasons more thoroughly discussed *infra* at 245–46, MSBI has failed to allege injury-in-fact with respect to its claims based on the Bond Registration statement.

### B. The Section 11 Claim Based on the Merger Registration Statement (Count 3) Is Timely

E & Y argues that MSBI's Merger Registration Section 11 claim must be dismissed because the claim is based on information readily available since 1999.

Memorandum of Defendant Ernst & Young LLP in Support of Its Motion to Dismiss Consolidated Amended Class Action Complaint, dated July 14, 2003 ("E & Y Memo"), at 15. Before determining whether MSBI was on inquiry notice for its Section 11 claim against E & Y, the Court must first determine the potential scope of Section 11 liability. Because Section 11 imposes liability on an auditor only for material misstatements or omissions in an audit report that is included in an SEC registration statement with the auditor's consent, the 6/30/99 AOL Opinion is the only allegedly misleading E & Y report which can form the basis of Section 11 liability. Therefore, E & Y's exposure under Count Three is limited to material misstatements or omissions in the 6/30/99 AOL Opinion.

With respect to the 6/30/99 AOL Opinion, plaintiff identifies two transactions that caused the June 30, 1999 AOL Opinion to be misleading—online advertising purchases by Sun Microsystems and Hughes Electronics.[44] E & Y Memo at 17. Thus, if MSBI was on inquiry notice of the key facts underlying these transactions more than a year before July 14, 2002, Count Three is time-barred.

■ A defendant seeking to establish that a plaintiff was on inquiry notice as a matter of law "bear[s] a heavy burden." *Warnaco*, 335 F.3d at 194. "Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct." *Warnaco*, 335 F.3d

---

44. According to the Amended Complaint, the Sun transaction, announced on November 24, 1998, involved the swap of advertisements for computer equipment. AC § 158. AOL allegedly agreed to buy $500 million in computer equipment from Sun at list price, even though companies like AOL typically buy for a 30% discount. *Id.* In turn, Sun agreed to pay AOL $350 million for advertising services. *Id.* A contemporaneous agreement provided for Sun to pay AOL more than $310 million per year as part of a three-year partnership called "iPlanet." *Id.* AOL then treated these payments from Sun as recurring revenue, despite the fact that in effect, AOL was receiving back some of its own expenditures. *Id.*

at 194 (*quoting Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F.Supp. 243, 249 (S.D.N.Y.1993)). In support of its contention that MSBI was on inquiry notice of the facts underlying its Section 11 claim, E & Y contends that the SEC filings released at the time of the Sun and Hughes deals provided all of the material information a reasonable investor would have wanted regarding the transactions and thus were sufficient to trigger plaintiff's duty to inquire. E & Y Memo at 18–20. The Court disagrees. *See supra* at 209–12. The 1998 and 1999 SEC filings relied upon by E & Y as a basis of inquiry notice are not sufficient to meet defendant's "heavy burden" of establishing uncontroverted evidence which irrefutably demonstrates the fraudulent conduct. In addition, in light of the Court's determination that the SEC filings and press releases describing the Sun and Hughes transactions were insufficient to trigger MSBI's duty to inquire with respect to AOL and AOLTW, it would be illogical to now hold that those releases were sufficient to form the basis of inquiry notice against Ernst & Young.[45]

### 1. The Section 11 Merger Registration Claim Is Pled With Particularity

█ Recently, the Second Circuit held that the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud. *Rombach v. Chang*, 355 F.3d 164 (2d Cir.2004). Accordingly, for the same reasons that the Court found that MSBI's Section 11 claims

against AOL and AOLTW "sound in fraud," the Court also finds that MSBI's Section 11 claims against Ernst & Young "sound in fraud," and are thus subject to the heightened pleading requirements of Rule 9(b). *See supra* at 213–14.

Despite the heavier burden imposed on Section 11 plaintiffs by *Rombach*, the Court finds that MSBI has satisfied that burden with respect to its Section 11 claims against defendant Ernst & Young. Plaintiff's allegations regarding E & Y's alleged Section 11 violations based on the Sun and Hughes transactions are not merely "rote conclusions," but rather particularized pleadings which allege that AOL's recognition of advertising revenue from the Hughes deal was inflated because AOL overvalued the Series H stock by refusing to discount for time value and marketability (the stock was not convertible until June 2002, three years after the deal was consummated). *See* AC ¶ 186–191. Further, the pleadings allege that it was not until March 25, 2002 that AOL reported a charge of approximately $270 million to reflect an other-than-temporary decline in the carrying value of AOLTW's investment in Hughes.[46] AC ¶ 190. In sum, neither Rule 9(b) nor *Rombach* provide any basis upon which to dismiss MSBI's Section 11 claim based on the Merger Registration Statement against Ernst & Young.

### C. MSBI's Section 10(b) Claim Against E & Y Properly Pleads Scienter

To state a cause of action under Section 10(b) and Rule 10b–5, "a plaintiff must

---

**45.** For the reasons discussed *supra* at 231–32, E & Y's motion to dismiss for failure to plead loss causation is denied.

**46.** Of note, in January 2003, AOLTW sold its stake in Hughes for $800 million, resulting in a total writedown of $700 million. AC ¶ 191. In addition, according to a Hughes SEC From

8–K, filed on March 3, 2003, Hughes and AOLTW entered into an agreement terminating their strategic alliance, whereby Hughes was released from its commitment to spend an additional $1 billion in marketing and promotional efforts to support the companies' joint products and services. *Id.*

plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action cause [plaintiff] injury." *See Chill v. General Elec. Co.*, 101 F.3d 263, 266 (2d Cir.1996) (citation omitted). Defendant E & Y contends that MSBI has not met the requirements of Section 10(b) and thus its Section 10(b) claims must be dismissed.

### 1. No Class Member Who Purchased Shares Prior to August 13, 1999 Has a 10(b) Claim Against Ernst & Young

The Amended Complaint defines the purported class as all persons who purchased, exchanged, or otherwise acquired publicly traded securities of AOL and AOLTW from January 17, 1999 through July 24, 2002. AC ¶ 65. However, the earliest alleged misstatement that MSBI attributes to E & Y is the 6/30/99 AOL Opinion, which was not publicly disseminated until August 13, 1999 when it was included in AOL's Form 10–K for fiscal 1999. *See* Kulka Decl. Tab 5 at 72–73 of 112.

"It is well established that to meet the 'in connection with' requirement [of Section 10(b)], the fraud practiced must have been prior to or contemporaneous with" the purchase or sale of securities. *Gold-man v. McMahan, Brafman, Morgan & Co.*, 706 F.Supp. 256, 259 n. 3 (S.D.N.Y. 1989). Thus, MSBI cannot establish, nor does it appear to try,[47] that anyone who purchased before August 13, 1999 relied on E & Y's alleged misstatements—another essential element of a 10(b) claim. As such, any and all 10(b) claims against E & Y by class members who purchased stock prior to August 13, 1999 are dismissed.

### 2. The 10(b) Claims Are Pled with Particularity

As stated previously, Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Here, E & Y contends that MSBI has not pled its 10(b) claim with the requisite particularity. Ernst & Young is wrong. The Amended Complaint contains numerous particularized allegations of deficiencies in E & Y's audit procedures and specific "red flags" that were ignored by E & Y. *See generally* AC ¶ 614–615. Rather than being "blanket statements of wrongdoing," *Segarra v. Messina*, 153 F.R.D. 22, 28 (N.D.N.Y. 1994), MSBI's 10(b) allegations against E & Y are sufficiently particularized. Significantly, having adequately detailed the alleged fraud with respect to AOLTW's transactions with Homestore, MSBI pleads that Ernst & Young specifically vouched for the propriety of those deals.[48] In sum, MSBI's allegations regarding E & Y's al-

---

**47.** At no point, either in its Complaint or its Opposition Memorandum, does MSBI argue that investors who purchased prior to August 13, 1999 have a cognizable 10(b) claim against E & Y.

**48.** Regarding the Homestore transactions in particular, AOLTW spokesman John Buckley stated in an August 6, 2002 *Los Angeles Times* article that, "AOL's accounting for all transactions with Homestore.com were appropriate and signed off by our outside auditors, Ernst & Young." AC ¶ 594. More broadly, in July 2002, Richard Parsons, in a conference call following the publication of *The Washington Post* articles, stated, "They [Ernst & Young] have confirmed in writing, without qualification, that the accounting for each and every one of the transactions mentioned in *The Washington Post* articles and the related financial statement disclosures for those transactions were appropriate and in accordance with GAAP." MSBI Opp. at 72, referring to AC ¶ 592.

leged 10(b) violations are sufficient to provide E & Y with fair notice of MSBI's claim. *See Acito,* 47 F.3d at 52. Accordingly, Rule 9(b)'s particularity requirement is satisfied.[49]

### 3. MSBI Has Pled Facts Giving Rise To A Strong Inference that E & Y Acted With Scienter

The PSLRA also mandates that a plaintiff asserting a Section 10(b) claim must plead allegations giving rise to a strong inference of scienter. 15 U.S.C. § 78u–4(b)(2). In the Second Circuit, there are two ways that a plaintiff can satisfy the scienter pleading standard: (1) by alleging facts demonstrating a motive and opportunity to commit fraud; or (2) by alleging circumstances indicating conscious or reckless behavior by the defendant. *Kalnit v. Eichler,* 264 F.3d 131, 138–39 (2d Cir. 2001).

#### a. MSBI Has Not Alleged Motive and Opportunity

MSBI alleges that E & Y was motivated to commit accounting fraud in order to continue receiving the fees that AOL and AOLTW paid to E & Y for the services it rendered to those companies. AC ¶¶ 609, 618, 807. The Court disagrees. Receipt of compensation and maintenance of a profitable business relationship for auditing services do not constitute a sufficient motive for scienter. *Zucker v. Sasaki,* 963 F.Supp. 301 (S.D.N.Y.1997).[50]

#### b. MSBI Has Adequately Alleged Reckless Misbehavior by E & Y

██ For recklessness on the part of a non-fiduciary accountant to satisfy securi-

ties fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. *Rothman,* 220 F.3d at 90. Recklessness requires a showing that the auditor's practices "amount[ed] at best to a pretended audit." *Id.* at 98. *See also Zucker,* 963 F.Supp. at 307 (plaintiff asserting a 10(b) claim must prove that the auditing practices were so deficient that the audit amounted to no audit at all.). According to E & Y, the Amended Complaint does not satisfy the Second Circuit's recklessness requirement. The Court disagrees.

#### i. The Allegations in the Amended Complaint are Both Factually and Legally Distinguishable from *Zucker*

E & Y's argument that the Amended Complaint fails to establish scienter is based primarily on analogizing this case to *Zucker.* That analogy, however, fails. In its papers, E & Y cites *Zucker* for the propositions that, "general allegations of GAAP and GAAS violations fail to satisfy the scienter requirements," and "the mere misapplication of accounting principles by an independent auditor does not establish scienter." E & Y Memo at 30, citing *Zucker,* 963 F.Supp. at 307–08. While both of these statements of law are correct, *i.e.,* allegations of GAAP and GAAS violations are not sufficient, on their own, to establish scienter, they both overlook the fundamental distinction between *Zucker* and this case. The complaint in *Zucker* did not contain any allegations of "red flags" ignored by the auditor defendant, which the Amended Complaint in this case

---

**49.** Ernst & Young's protestations notwithstanding, Rule 9(b) does not contemplate a higher standard for pleading fraud by an independent auditor than for pleading fraud by any other 10(b) defendant.

**50.** Indeed, MSBI appears to concede this, focusing its Opposition Memorandum almost exclusively on the "conscious or reckless behavior" avenue of pleading scienter.

does.[51] *See* AC ¶¶ 614–615. In addition, the plaintiff's claim in *Zucker* that E & Y [52] knew or recklessly disregarded adverse facts was, "in essence, based solely on Ernst & Young's status as an auditor." *Zucker,* 963 F.Supp. at 309. The Amended Complaint in this case alleges far more. The presence of both "red flags" and specific allegations beyond E & Y's status as an auditor in MSBI's Amended Complaint distinguish this case from *Zucker.*

### ii. When Combined With the GAAS and GAAP Violations and AOLTW's Dependence on Advertising Revenue to Meet Earnings Targets, the "Red Flags" Allegedly Ignored by E & Y Are Sufficient to Plead Scienter

Allegations of "red flags," when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter. *In re Complete Mgmt. Inc. Sec. Litig.,* 153 F.Supp.2d 314, 334 (S.D.N.Y.2001). *See also Van de Velde v. Coopers & Lybrand,* 899 F.Supp. 731, 736 (D.Mass.1995) ("[A] complaint will usually survive a motion to dismiss if plaintiffs have alleged the existence of 'red flags' sufficiently attention-grabbing to have alerted a reasonable auditor to the audited company's shenanigans.").

Here, in addition to the numerous GAAP and GAAS violations, MSBI has alleged a series of "red flags" which it claims that E & Y either ignored, or should have discovered through reasonable diligence. In particular, two of these "red flags" are significant. First, plaintiff alleges that E & Y ignored the fact that material amounts of advertising revenue came in at the end of each quarter just in time to permit AOL and AOLTW to hit its advertising revenue targets, AC ¶ 614(b). Such late-in-the-quarter revenue recognition has been found sufficient to support a claim of scienter. *In re Homestore.com, Inc. Sec. Litig.,* 252 F.Supp.2d 1018, 1044 (C.D.Cal.2003) (finding that "the most significant of these red flags was the fact that on numerous occasions, major transactions took place within the last few days of the quarter"). Second, the plaintiff has alleged that E & Y ignored several of AOL and AOLTW's complex barter transactions that generated gains or earnings growth while the amounts of cash transacted were simply exchanges of like amounts. *See* AC ¶ 615(a). Given the critical role that advertising revenue played in AOL and AOLTW's ability to meet its earnings targets, the magnitude and recurrence of the barter transactions, including Veritas, are problematic. *See In re Complete Mgmt.,* 153 F.Supp.2d at 334. In light of the centrality of advertising revenue to AOL and AOLTW's earnings targets, the combination of these two "red flags" with the numerous GAAS and GAAP violations is sufficient to support an inference of scienter. Accordingly, defendant Ernst & Young's motion to dismiss the Section 10(b) claim is denied.

("'Red flags' are those facts which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.").

**51.** "Red flags," or audit risks, are the various "risk factors" that auditors must consider under GAAS when performing an audit. According to AU § 312.02, audit risk is "the risk that the auditor may unknowingly fail to appropriately modify his or her opinion on financial statements that are materially misstated." *See also In Re Sunterra Corp. Sec. Litig.,* 199 F.Supp.2d 1308, 1333 (M.D.Fla.2002),

**52.** Ernst & Young was also the defendant in *Zucker.*

### D. MSBI's Section 14(a) Claim, as Circumscribed Below, is Actionable

██ In Count Sixteen, MSBI alleges that E & Y violated Section 14(a) of the Exchange Act and Rule 14a–9 promulgated thereunder, because its allegedly false and misleading audit opinions were incorporated in the Joint Proxy Statement that preceded the shareholders' approval of the Merger. AC ¶¶ 778–788. To state a claim under Section 14(a), a plaintiff must allege that: (1) the proxy statement contained a material misstatement or omission, which (2) caused plaintiff's injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. *See Bond Opp'ty Fund v. Unilab Corp.*, No. 99 Civ. 11074 (JSM), 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003).[53]

As a threshold matter, for the reasons first delineated *supra* at 209–12, the Court finds that MSBI's Section 14(a) claim against E & Y is timely.

Having determined that the 14(a) claim is timely, the Court must decide which members of the putative class are entitled to assert such claims against MSBI. "The purpose of [Section] 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations." *J. I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Section 14(a) and Rule 14a–9 regulate the proxy solicitation process and "prohibit[ ] the solicitation of proxies by means of materially false or misleading statements." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1087, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). Section 14(a)'s emphasis on the proxy solicitation process indicates that the statute was designed to protect only those shareholders with voting rights. *See 7547 Corporation v. Parker & Parsley*, 38 F.3d 211, 229–230 (5th Cir.1994) (finding that "it goes too far to allow persons not even entitled to vote to assert a claim under § 14(a)"). *See also* Hazen, *The Law of Securities Regulation* § 11.3 (3d ed. 1995) ("[S]ince the proxy regulations are designed to protect shareholder voting rights, standing should be limited to shareholders who had a right to vote.").[54] Accordingly, only shareholders who owned Time Warner common stock on the record date of the Merger are permitted to bring Section 14(a) claims; *i.e.*, no class member who lacked voting rights has standing to assert a 14(a) claim against E & Y.

██ Next, the Court needs to determine the scope of E & Y's potential liabili-

---

**53.** While it is very clear that the Second Circuit's decision in *Rombach*, 355 F.3d 164, elevated the pleading standard for fraud-based Section 11 and Section 12(a)(2) claims, it is less clear what effect *Rombach* had on the pleading requirements for Section 14(a) claims. However, even assuming that Section 14(a) claims which "sound in fraud" are now subject to a heightened standard of particularized pleading, MSBI has satisfied that standard here with respect to the 6/30/99 AOL Opinion.

**54.** MSBI takes the position that Time Warner shareholders acquiring stock pursuant to the merger, whether or not they were eligible to participate in the shareholder vote approving the Merger, can sue under § 14(a). MSBI Opp. at 90. This is fundamentally inconsistent with the purpose of 14(a), which is to protect the integrity of the *proxy solicitation process*. Further, in each of the cases cited by MSBI in support of its position, the shareholders at issue *did* have voting rights. *See, e.g., Hershfang v. Knotter*, 562 F.Supp. 393, 398 (E.D.Va.1983); *Jones v. Nat'l Distillers and Chem. Corp.*, 484 F.Supp. 679, 684 (S.D.N.Y.1979); *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190 (2d Cir.1993); and *Gerstle v. Gamble–Skogmo, Inc.*, 298 F.Supp. 66 (E.D.N.Y.1969).

ty under Section 14(a). More specifically, the Court must decide whether the 6/30/00 AOL Opinion can form the basis of MSBI's Section 14(a) claim. After a careful and thorough review of both parties' submissions on this issue, the Court finds that the 6/30/00 AOL Opinion cannot form the basis of plaintiff's 14(a) claim.[55] Put simply, the 6/30/00 AOL Opinion post-dated the mailing of the Proxy/Prospectus and the shareholder vote on the Merger. It therefore cannot constitute a "solicitation" under Section 14(a). *See* 17 C.F.R. § 240.14a–1 (defining solicitation as any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy"). Accordingly, the only E & Y audit report that is actionable under Section 14(a) is the 6/30/99 AOL Opinion.

## XX. MORGAN STANLEY'S MOTION TO DISMISS COUNTS FOUR AND SEVENTEEN IS GRANTED

 Before Time Warner, Inc. agreed to merge with America Online Inc., the Time Warner Board asked Morgan Stanley to provide its opinion as to whether the terms of the proposed merger were fair to Time Warner shareholders.[56] After reviewing certain public information, as well as information provided by the two companies, Morgan Stanley informed the Time Warner Board on January 9, 2000 that the terms of the proposed merger were, from a financial point of view, fair to the Time Warner shareholders. It is this "fairness opinion" that forms the basis of MSBI's claims against Morgan Stanley.

Lead Plaintiff MSBI alleges that Morgan Stanley's fairness opinion was false and misleading because AOL's stock was overvalued and thus the exchange ratio was not, in fact, fair to Time Warner shareholders. *See* AC ¶¶ 700, 788. MSBI asserts two claims against Morgan Stanley based on its fairness opinion. First, because the fairness opinion was incorporated into the Merger Registration Statement, plaintiff alleges that Morgan Stanley violated Section 11 of the Securities Act, which creates civil liability for any registration statement that "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). This claim is asserted "on behalf of all Class members who acquired AOL Time Warner common stock pursuant and/or traceable to the Merger Registration Statement, including in exchange for Time Warner common stock." AC ¶ 698.

Second, because the fairness opinion was incorporated into the proxy statement, MSBI alleges that Morgan Stanley violated Section 14(a) of the Securities Exchange Act and Rule 14a–9 promulgated thereunder, which impose civil liability on persons who solicit proxies that contain

**55.** The Court finds that E & Y's Reply Memorandum does not raise any "new" arguments, as MSBI contests in a letter to the Court dated November 25, 2003. The E & Y reply argument in question, whether the 6/30/00 AOL Opinion was incorporated into the Merger Registration Statement, was featured prominently in E & Y's opening memorandum. However, given that MSBI's November 25, 2003 letter and E & Y's December 2, 2003 both provided detailed information regarding the incorporation argument, the Court considered them both in determining that MSBI's Section 14(a) claim could be based only on the 6/30/99 AOL Opinion.

**56.** Specifically, the Time Warner Board asked Morgan Stanley to provide its opinion as to whether the ratio at which Time Warner shares would be exchanged for AOLTW shares-the "exchange ratio"-was "fair from a financial point of view" to Time Warner shareholders.

"false or misleading" statements of material fact or that omit material facts. 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a–9(a). This claim is asserted "on behalf of all Class members who held Time Warner common stock at the close of business on May 18, 2000, the record date of eligibility to vote, and on June 23, 2000, the date of the Special Meetings in which the Merger was voted upon and approved." AC ¶ 786.

At the outset, the Court, for all of the reasons heretofore delineated, finds that MSBI's claims against Morgan Stanley are not time-barred. *See supra* at 209–12. Although plaintiff's claims against Morgan Stanley were not added until the April 2003 Amended Complaint, because the Court has already concluded that no reasonable investor was on notice prior to July 18, 2002, the added claims are still timely.

### A. Statements of Opinion Are Actionable Only if Both Objectively and Subjectively False

In *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1092–1096, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), the Supreme Court held that a statement of opinion is false and actionable only if the opinion is both (1) not believed by the speaker, and (2) objectively untrue.[57] Prior to *Virginia Bankshares*, the Second Circuit had already held that a complaint failed to state a claim under the 1933 and 1934 Acts because, "there [was] no allegation" that the financial advisors "did not hold the joint opinion" challenged by plaintiffs. *Friedman v. Mohasco Corp.*, 929 F.2d 77, 79 (2d Cir.1991). *See also In Re McKes-*

*son HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1265 (N.D.Cal.2000) ("In the case of a fairness opinion, then, the plaintiff must plead with particularity why the statement of opinion was objectively and subjectively false"). Courts in this Circuit have followed the lead of *Virginia Bankshares*. For example, in *Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074(JSM), 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003), the court stated: "Plaintiffs who charge that a statement of opinion, including a fairness opinion, is materially misleading, must allege 'with particularity' 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false." In clarifying, the court found that "the plaintiff must show both that the directors did not actually hold the belief or opinion stated, *and* that the opinion stated was in fact incorrect." *Id.* (emphasis in original).

Here, the Amended Complaint contains no allegation that Morgan Stanley in January 2000 did not believe its stated opinion that the exchange ratio was fair to Time Warner shareholders. Indeed, the Amended Complaint alleges only that the fairness opinion was objectively false, *i.e.,* that the exchange ratio was not fair "because AOL stock was overvalued and AOL had engaged in sham transactions and improper accounting." *See* AC ¶¶ 651, 700, 788. The failure to allege any facts, let alone 'provable' 'particularized' facts, that Morgan Stanley did not believe its stated opinion, is fatal to both MSBI's Section 11 and Section 14(a) claims.

**57.** MSBI's attempt to circumscribe the holding of *Virginia Bankshares* is unavailing. *See* Memorandum of Lead Plaintiff MSBI in Opposition to Motion to Dismiss of Bond Underwriter Defendants, and Motion to Dismiss of Defendant Morgan Stanley as Financial Advisor, dated September 29, 2003 ("MSBI Underwriter Opp."), 16–20. A careful read of that opinion reveals that it is not nearly as narrow as plaintiff contends. Indeed, the conspicuous absence of any cases supporting MSBI's "interpretation" of *Virginia Bankshares* is telling.

Further undermining the case against Morgan Stanley is that the fairness opinion itself makes clear that Morgan Stanley based its opinion on information provided by others and that Morgan Stanley "assumed and relied upon" that information "without independent verification" of its "accuracy and completeness." Fairness Opinion at F–2. Indeed, the fairness opinion expressly discloses that Morgan Stanley "[has] not made and [has] not assumed responsibility for making any independent valuation or appraisal of the assets or liabilities of America Online or Time Warner." *Id.* Such a disclaimer nullifies MSBI's claim that Morgan Stanley was reckless by "turning a blind eye to AOL's accounting fraud." MSBI Underwriter Opp. at 20. Put simply, it was not Morgan Stanley's job to independently investigate AOL's accounting; indeed, Morgan Stanley explicitly disclosed this by disavowing any such independent investigation in the fairness opinion itself.[58] It would be nonsensical to attach Section 11 liability to the issuer of a fairness opinion for failure to investigate the financials of the underlying company, when the issuer has expressly stated that it relied on the integrity of the information provided by the company.[59]

Because both the Amended Complaint and MSBI's Opposition Memorandum fail to allege any facts which indicate that Morgan Stanley did not believe its stated January 2000 opinion, and because Morgan Stanley expressly disclosed that it relied

upon the financials provided to it by the two companies, there is simply no cognizable claim against Morgan Stanley. Accordingly, Counts Four and Seventeen are dismissed with prejudice.

## XXI. THE MOTION TO DISMISS OF THE BOND UNDERWRITERS AND DEFENDANT CITIGROUP IS GRANTED

On April 19, 2001, AOLTW, pursuant to a Prospectus Supplement to the Bond Registration Statement dated April 11, 2001 ("April 11, 2001 Bond Offering"), issued $4 billion of bonds. The bonds were issued in three denominations, with maturities of 5, 10 and 30 years, respectively. Depending upon their maturity, the bonds accrue interest at annual rates of 6.125%, 6.750% and 7.625%, respectively, payable semi-annually. The offering prices for the bonds were 99.793%, 99.750% and 99.803% of par value, respectively. *See* Butler Decl. Ex. 42.

AOLTW subsequently issued an additional $6 billion of bonds on April 8, 2002, pursuant to a Prospectus Supplement to the Bond Registration Statement April 3, 2002 ("April 3, 2002 Bond Offering"). The bonds were issued in four denominations, with maturities of 3, 5, 10 and 30 years, respectively. Depending upon their maturity, the bonds accrue interest at annual rates of 5.625%, 6.150%, 6.875% and 7.700%, respectively, payable semiannual-

---

**58.** MSBI's attempt to shoehorn "subjective knowledge of falsity" into its Amended Complaint by alleging that Morgan Stanley had extensive knowledge of AOL's financial situation vis-à-vis its role as the underwriter of over $1.35 billion in AOLTW bonds, is entirely unpersuasive. MSBI Underwriter Opp. at 20.

**59.** In dismissing, without leave to replead, a strikingly similar case in this circuit involving a Section 11 claim against Donaldson, Lufkin

& Jenrette ("DLJ") regarding a fairness opinion, the court rejected plaintiff's assertion that DLJ should be held liable under Section 11 for failure to conduct a reasonable investigation of the financial information provided by Global Crossing ("GC"), stating that DLJ's fairness opinions "expressly revealed that [DLJ] had taken the financial information provided by GC at face value." *In Re Global Crossing, Ltd. Sec. Litig.*, 313 F.Supp.2d 189, 210 (S.D.N.Y.2003).

ly. The offering prices for the bonds were 99.681%, 99.685%, 99.050% and 99.376% of par value, respectively.

The Amended Complaint brings claims under Sections 11 and 12(a)(2) of the Securities Act, based upon allegations that the offering documents relating to the bonds issued by AOLTW in April 2001 and April 2002 contained misrepresentations or omissions. AC ¶¶ 656–676, 722–727, 741–747.

The Underwriter Defendants allegedly served as underwriters for both of these bond offerings. AC ¶¶ 48–64. MSBI asserts the claims against the Underwriter Defendants on behalf of all members of the Purported Class "who purchased or acquired AOL Time Warner Bonds issued in the April 2001 and/or April 2002 Offerings pursuant to and/or traceable to the Bond Registration Statement and Prospectus Supplement thereto." AC ¶¶ 722, 741.[60]

### A. Plaintiffs Lack Article III Standing

Article III of the U.S. Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. Art. III, § 2. A federal court has the obligation to assure itself, at the outset of the litigation, that the plaintiff has Article III standing. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." (internal quotations omitted)).

To satisfy Article III's standing requirements, a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth*, 528 U.S. at 180–181, 120 S.Ct. 693.

"The burden to establish standing rests on the party asserting its existence." *Miller v. Silbermann*, 951 F.Supp. 485, 489 (S.D.N.Y.1997). At the pleading stage, the plaintiff bears the burden of "clearly ... alleg[ing] facts demonstrating that [it] is a proper party to invoke judicial resolution of the dispute." *Bd. of Educ. v. New York State Teachers Ret. Sys.*, 60 F.3d 106, 109 (2d Cir.1995) (quoting *FW/PBS, Inc., v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)).

### 1. MSBI Has Not Alleged "Injury in Fact"

On April 15, 2003, the date on which the Underwriter Defendants were added to the Amended Complaint, the AOLTW bonds that form the basis of MSBI's claims were trading at significant premiums to their offering prices.[61] For example, the 6.125% Notes due April 15, 2006, which were offered at $99.793, were trading at $105.888 on April 15, 2003. *See* Declaration of Ronald Garber dated July 14, 2003 ("Garber Decl.") ¶ 2. Similarly, the 7.700% Debentures due 2032, which were

---

**60.** The Bond Underwriters contention that MSBI's claims are barred by the statute of limitations is unpersuasive for the reasons delineated *supra* at 209–12.

**61.** On a motion to dismiss, a court may take judicial notice of the market prices of publicly traded securities without converting the motion to a summary judgment motion. *See Ganino*, 228 F.3d at 167, n. 8.

offered at $99.376, were trading at $107.800 on April 15, 2003. *Id.* Rather than alleging any losses on AOLTW bonds, the allegations of the Amended Complaint reveal that AOLTW bonds purchased by Lead Plaintiff have actually increased in value. Indeed, each of the bonds at issue was trading at a minimum of $4.169 more per unit than when it was purchased. Absent any factual allegation of "injury in fact" plaintiffs lack Article III standing to assert claims against the Underwriter Defendants and Citigroup. As such, all of plaintiff's claims against the Bond Underwriters are dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

### 2. MSBI Has Not Pled Facts Which Establish an Injury Under Sections 11 and 12(a)(2)

In addition to the lack of Article III standing, MSBI's claims against the Bond Underwriters fail for the independent reason that the claims do not allege a cognizable injury under the statutes in which they have been brought.

### a. MSBI Has Not Demonstrated Losses Under Section 11(e)

■ Although a plaintiff has no obligation to plead damages under Section 11 of the Securities Act, *see In Re IPO Sec. Litig.*, 241 F.Supp.2d 281, 347 n. 76 (S.D.N.Y.2003), the plaintiff must nevertheless satisfy the court that she has suffered a cognizable injury under the statute. *See In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1203–05 (9th Cir.2002); *IPO Sec. Litig.*, 241 F.Supp.2d at 347 ("All Section 11 claims brought by plaintiffs who sold securities at prices above the offering price must be dismissed because these plaintiffs have no damages."). In fact, Section 11 itself defines the measure of damages recoverable in a suit under Section 11:

> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.

15 U.S.C. § 77k(e)(2003).

The AOLTW bonds issued in April 2001 and April 2002 both traded above their offering prices on April 15, 2003, the date the underwriter defendants were added to this lawsuit. Absent any losses under Section 11(e), plaintiffs lack statutory standing to assert their Section 11 claim against the Underwriter defendants.

### b. MSBI Has Not Stated A Claim for Damages or Rescission Under Section 12(a)(2)

■ A plaintiff asserting a claim under Section 12(a)(2) is entitled to two forms of relief: (1) damages or (2) rescission. Section 12(a)(2) provides:

> [A party] shall be liable ... to the person purchasing such security from him, who may sue either at law or equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon,

upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77*l*(a)(2). If the plaintiff still owns the security, he is entitled to rescission, but not damages; if he no longer owns the security, damages, not rescission, are the appropriate remedy. *See Randall v. Loftsgaarden*, 478 U.S. 647, 655, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986).

The proper time for the plaintiff to choose between damages and rescission "is at the time the complaint is filed." *Wigand v. Flo–Tek, Inc.*, 609 F.2d 1028, 1035 (2d Cir.1979).[62] The Crawford Affidavit notwithstanding, plaintiff has not adequately alleged that it sold any of the bonds issued in April 2001 or April 2002.[63] Because plaintiff fails to allege that it no longer owns the bonds, let alone that it actually sold the bonds at a loss, it has not stated a claim for damages under Section 12(a)(2).

Having failed to state a claim for damages, MSBI's only possible remedy under 12(a)(2) is rescission. As a condition of requesting rescission, plaintiff is required to tender his securities. *See* 15 U.S.C. § 77*l*. Here, there has been no demand for rescission; only a contention that an explicit request for rescission is not required.[64] *See* MSBI Underwriter Opp. at 10, citing *WorldCom*, 2003 WL 21219049, at *28. The Court disagrees. *See Morin v. Trupin*, 747 F.Supp. 1051, 1063 (S.D.N.Y.1990) ("A complaint that does not plead at least an offer of tender is insufficient and subject to dismissal."). An investor cannot be allowed to delay a demand for rescission while he "watch[es] the market go up or down, thereby speculating on the success or value at the total risk of the wrongdoer." *Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.*, 821 F.Supp. 212, 220 (S.D.N.Y.1993). MSBI's claims against the Bond Underwriters are fatally flawed because they do not allege a cognizable injury under the statutes in which they have been brought. Accordingly, the Bond Underwriters' motion to dismiss is granted. In addition, due to the glaring weakness of these claims, plaintiff's request for leave to amend is denied.

## XXII. LEAVE TO REPLEAD

When a cause of action is dismissed because of pleading deficiencies, plaintiff is

---

**62.** MSBI contends that Section 12(a)(2) rescission damages are measured as of the date the initial Complaint was filed. *See* MSBI Underwriter Opp. at 9. Thus, according to the plaintiff, the two relevant dates for calculating rescission damages are July 18, 2002, the date of filing of the first of the now-consolidated class actions, and September 16, 2002, the date MSBI filed its initial complaint; on both of these dates, the AOLTW bonds were trading below their offering price. The problem with this, however, is that neither the July 18 nor the September 16 complaints asserted claims against the Bond Underwriters. The first date that there were any claims asserted against the Underwriter Defendants was April 15, 2003, when the AOLTW bonds were trading at a premium.

**63.** MSBI contends that it has properly pled damages vis-à-vis Exhibit C of the Affidavit of Bryan L. Crawford in Further Support of Motion to Appoint the Minnesota State Board of Investment as Lead Plaintiff and to Approve Its Selection of Lead Counsel ("Crawford Affidavit"). There are, however, significant problems with the Crawford Affidavit, not the least of which is that the Court, try as it may, cannot make heads or tails of it. Additionally, the exhibit is unsworn and fails to reveal how much MSBI paid for the bonds it allegedly sold. In short, the Crawford Affidavit provides no basis for concluding MSBI sold any AOLTW bonds, let alone that it sold such bonds for a loss.

**64.** Lead Plaintiff has also explicitly rejected the offer of rescission made by AOL Time Warner. *See* Butler Decl. Ex. 4. Such rejection, of course, is not surprising given that the bonds are trading at a significant premium over their offering price.

usually permitted to replead its case. *See* Fed.R.Civ.P. 15(a) ("Leave [to replead] shall be freely given when justice so requires."). This policy is especially appropriate in the context of claims dismissed under Rule 9(b) because the law favors resolving disputes on their merits. *See Acito,* 47 F.3d at 54–55. This does not mean, however, that every securities fraud claim is entitled to repleading. For example, where a claim is dismissed as a matter of law because it fails to state a claim, repleading would be "futile." *Lucente v. Int'l Bus. Mach. Corp.,* 310 F.3d 243, 258 (2d Cir.2002).

Here, the absence of any injury with respect to the Sections 11 and 12(a)(2) claims based on the Bond Registration Statement would render repleading "futile." As a result, leave to replead is denied with respect to any and all claims based on the Bond Registration Statement and/or the Bond Offerings. In addition, MSBI may not replead either the Section 11 Claim based on the Merger Registration Statement or the Section 14(a) claim against defendant Morgan Stanley, as Morgan Stanley's disclosure with respect to its fairness opinion precludes liability as a matter of law. However, the claims that have been dismissed for failure to adequately plead scienter and/or culpable participation are entitled to repleading.[65]

## XXIII. CONCLUSION

A court will grant a defendant's motion to dismiss only if it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. Such is not the case here. Having carefully read the Amended Complaint and all of the parties' papers and supplemental submissions, it becomes quite clear that MSBI is entitled to offer evidence to support (most of) its claims involving the defendants "systematic and fraudulent scheme to inflate the advertising revenue reported in the companies' publicly disclosed financial statements and, in turn, the value of AOL and AOLTW securities," by at least $1.7 billion.

Accordingly, the plaintiff may submit to the Court, no later than June 3, 2004 a proposed Second Amended Complaint. The Second Amended Complaint shall be accompanied by a Memorandum of Law indicating how the defects in the Amended Complaint have been cured. Thereafter, the Court will either grant leave to amend, or enter an Order dismissing the still defective portions of the Complaint with prejudice.

SO ORDERED.

### *Appendix 1: Section 11*

**Defendants Against Whom the Section 11 Claims Based on the Bond Registration Statement Are Dismissed With Prejudice:**

1. AOL Time Warner
2. Ernst & Young LLP
3. Bond Underwriter Defendants (including Morgan Stanley & Co., Salomon Smith Barney Inc., Citigroup, Inc., Banc of America Securities LLC and J.P. Morgan Chase & Co.)
4. Stephen M. Case
5. Robert W. Pittman
6. J. Michael Kelly
7. David M. Colburn
8. Barry Schuler
9. Kenneth J. Novack

**65.** Specifically, the Section 10(b) claims against Stephen Case, Myer Berlow, Barry Schuler, Kenneth J. Novack, Gerald Levin, Richard Parsons, Joseph Ripp and Steven Rindner may be repled. Additionally, the Sections 15 and 20 claims that have been dismissed may be repled.

10. Eric Keller
11. Gerald M. Levin
12. Wayne Pace
13. Richard D. Parsons
14. Joseph A. Ripp
15. Paul T. Cappuccio
16. Daniel F. Akerson
17. James W. Barge
18. Stephen F. Bollenbach
19. Frank J. Caulfield
20. Miles R. Gilburne
21. Franklin D. Raines

**Defendants Against Whom the Section 11 Claim Based on the Merger Registration Statement Is Dismissed With Prejudice:**

1. Morgan Stanley & Co.

### Appendix 2: Section 12

**Defendants Against Whom the Section 12(a)(2) Claim Based on the Bond Registration Statement Is Dismissed With Prejudice:**

1. AOL Time Warner
2. Bond Underwriter Defendants (including Morgan Stanley & Co., Salomon Smith Barney Inc., Citigroup, Inc., Banc of America Securities LLC and J.P. Morgan Chase & Co.)
3. Stephen M. Case
4. Robert W. Pittman
5. J. Michael Kelly
6. Barry Schuler
7. Kenneth J. Novack
8. Gerald M. Levin
9. Wayne Pace
10. Richard D. Parsons
11. Joseph A. Ripp
12. Paul T. Cappuccio
13. Daniel F. Akerson

14. James W. Barge
15. Stephen F. Bollenbach
16. Frank J. Caulfield
17. Miles R. Gilburne
18. Franklin D. Raines

### Appendix 3: Section 14(a)

**Defendants Against Whom the Section 14(a) Claims Are Dismissed With Prejudice:**

1. Morgan Stanley & Co.

### Appendix Four: Section 10(b)

**Defendants Against Whom the Section 10(b) Claims Are Dismissed:**

1. Stephen M. Case
2. Myer Berlow
3. Barry Schuler
4. Kenneth J. Novack
5. Gerald M. Levin
6. Richard D. Parsons
7. Joseph A. Ripp
8. Steven Rindner

### Appendix Five: Sections 15 and 20

**Defendants Against Whom the Sections 15 and 20 Claims Are Dismissed:**

1. Stephen M. Case
2. Myer Berlow
3. Barry Schuler
4. Kenneth J. Novack
5. Gerald M. Levin
6. Richard D. Parsons
7. Joseph A. Ripp